UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHARLES T. MCINTOSH,

                Plaintiff,

     -v-

UNITED STATES OF AMERICA, MR. P.
CONKLIN, MS. M. RECKTENWALD, MR. M.
WHINNERY, MR. SUSNEY, MR. J. DIEHL, MR. D.
HICKMAN, MR. A. DACHISEN, JOSEPH
MIRAGLIA, and BRAD MAGIE,

                Defendants.

Case No. 14-CV-7889 (KMK)

OPINION & ORDER

---

Appearances:

Charles T. McIntosh
*Pro se Plaintiff*
Pekin, IL

Natasha Waglow Teleanu, Esq.
United States Attorney's Office, SDNY
New York, NY
*Counsel for Defendants United States Of America, Mr. P. Conklin, Ms. M. Recktenwald, Mr. M. Whinnery, Mr. Susney, Mr. J. Diehl, Mr. D. Hickman, Mr. A. Dachisen, Joseph Miraglia, and Brad Magie*

KENNETH M. KARAS, District Judge:

        Charles T. McIntosh ("Plaintiff"), proceeding pro se, brings this action against the United

States of America, Patrick Conklin ("Conklin"), Monica Recktenwald ("Recktenwald"),

Matthew Whinnery ("Whinnery"), David Susney ("Susney"), Jason Diehl ("Diehl"), Derek

Hickman ("Hickman"), Andrew Dachisen ("Dachisen"), Joseph Miraglia ("Miraglia"), and Brad

Magie ("Magie"), asserting a host of constitutional violations.  Defendants move to dismiss on a

variety of grounds, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil

Procedure.  Additionally, Plaintiff seeks an injunction preventing Defendants from destroying certain evidence and requesting sanctions in connection with Defendants' failure to preserve those materials.  For the reasons that follow, Defendants' Motion is granted in part, and Plaintiff's Motion is denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from Plaintiff's Amended Complaint and, for purposes of resolving Defendants' Motion only, are presumed true.

#### 1.  Plaintiff's Assignment to the Special Housing Unit

At the time of the events giving rise to the instant Amended Complaint, Plaintiff was an inmate in Unit D-B at Otisville Correctional Facility ("Otisville"), and Conklin was a corrections officer at least initially in Unit D-A.  (*See* Am. Compl. ¶¶ 1–2, 6 (Dkt. No. 22).)  At some point in October or November 2013, after Conklin and another corrections officer completed the 10:00 pm lockdown count, Conklin told the inmates in Unit D-B that, "if he continue[d] to smell [cigarette] smoke in the dorm, he was going to turn off the TV[]s every night at 10[]pm."  (*See id.* ¶¶ 1–2.)[1]  Plaintiff then told Conklin that (1) he was not authorized to carry out that threat, (2) Conklin could not punish a whole unit for the behavior of individuals who chose to smoke, and (3) Plaintiff did not smoke.  (*See id.* ¶ 3.)  According to Plaintiff, "[i]t is the officer's job to catch/find th[ose] person[]s" who committed the infraction "and [to] punish them alone," but it was "wrong" "to try and force [the inmates] to do the officer's job," and, in any event, "[one] would need the administration's approval to authorize the turning off of the TV[]s."  (*Id.* ¶ 4.)

---

[1] Occasional phrases and sentences in Plaintiff's Amended Complaint are written in all capital letters.  Here and elsewhere, when quoting such phrases, this Opinion reverts to conventional capitalization for ease of readability.

After Plaintiff's statement, Conklin became agitated, and, "[f]rom that day [on]," Conklin's attitude toward Plaintiff "changed," and Conklin "verbally and ph[ys]ically [harassed]" Plaintiff every time that Conklin saw him.  (*See id.* ¶¶ 5–6.)  For instance, Conklin made "[s]arcastic comment[]s" to Plaintiff, searched Plaintiff as well as his carrying bag, and "stat[ed] that there [would] be a[ ]lot of changes when [Conklin] start[s] to work back in D-B next quarter."  (*See id.* ¶ 6.)

On December 6, 2013, Plaintiff walked out of Unit D-B "at the call of Insulin-line" and, after dinner, walked back to his unit, which required him to walk through Unit D-A.  (*Id.* ¶ 7.) As he was doing so, for under two minutes, he fielded a "legal question" from an inmate in Unit D-A "about the drug law[]s being litigated on by [C]ongress."  (*See id.* ¶¶ 8–9.)  That inmate followed Plaintiff into Unit D-B, (*see id.* ¶ 9), but was not issued an incident report, "[s]howing a clear case of targeting, personal vendetta, and retaliation against this Plaintiff etc.," (*see id.* ¶¶ 27–28).  Plaintiff entered his living area, and, about 30 minutes later, Conklin entered Unit D-B, walked past everyone directly to Plaintiff, and asked for his ID.  (*Id.* ¶¶ 10–12.)  Plaintiff asked Conklin why, and Conklin said that "he didn[']t have to tell [Plaintiff] why."  (*Id.* ¶ 12 (internal quotation marks omitted).)  When Plaintiff replied that Conklin indeed had to tell Plaintiff because Conklin was "not [Plaintiff's] unit officer" and because Plaintiff "should know why [his] ID [was] being requested," Conklin replied that Plaintiff would "find out soon."  (*See id.* (internal quotation marks omitted).)  Conklin then approached the same Unit D-B inmates whom he had earlier walked past and asked for their IDs in an attempt to avoid creating the impression that he was "singling Plaintiff out" or otherwise "personally attacking . . . Plaintiff." (*See id.* ¶ 13.)  These inmates were not issued incident reports.  (*See id.*)  Plaintiff asked the inmates why Conklin was taking the inmates' IDs, and, after the inmates said that

"[Conklin] was writing . . . up incident report[s] for being up-front in his unit," Plaintiff informed the inmates "that he has [Plaintiff] fucked up because [Plaintiff] [doesn't] associate with anyone in [Unit] D-A like that." (*See id.* ¶ 14.) Conklin heard this conversation as he was exiting Unit D-B. (*Id.* ¶ 15.)

Plaintiff then went to the office of the unit officer, whom he told that "Conklin just came . . . and took [Plaintiff's] ID for some unknown reason." (*Id.* ¶ 16.) The unit officer said that he would call Conklin and find out why, after which time Plaintiff's case manager, Ms. Ferdula ("Ferdula"), came into Unit D-B, had a conversation with the unit officer, and called Plaintiff into her office to ask what happened between Plaintiff and Conklin. (*Id.* ¶¶ 16–17.) After Plaintiff told her, she asked him to wait outside while she spoke to the unit officer and the other inmates whose IDs were taken. (*Id.* ¶ 17.) Ferdula then told Plaintiff that he was being called into the lieutenant's office. (*Id.*)

As Plaintiff entered the lieutenant's office, he noticed Lt. Munios ("Munios"), who supposedly had a problem with Plaintiff because he "exerc[ised] his due process right to grieve" by filing grievances on staff and others. (*Id.* ¶ 18.) Plaintiff knew that he would be assigned to the Special Housing Unit ("SHU") because the lieutenant finally had the opportunity. (*Id.*) Lt. Heli ("Heli") told Plaintiff what Conklin wrote in his incident report and then asked Plaintiff what happened. (*Id.* ¶ 19.) Plaintiff told the lieutenants the statement that he made was to directed to the inmates to whom he was talking, that Conklin was already out the door, and that "in no way was any threatening statement . . . made directly to . . . Conklin." (*Id.*) Plaintiff told the lieutenants that they could check his record and that Plaintiff was not one to disrespect staff or a fellow inmate in all his years in prison. (*Id.*) Plaintiff explained that he had just finished a heated phone call and was upset but never made a threatening statement toward Conklin. (*Id.*)

4

Munios said that, if it were up to him, he would throw Plaintiff in the SHU right then and there. (*Id.* ¶ 20.)  Heli then told Plaintiff that he would be placed in the SHU for the weekend to "'cool off' just in case [Plaintiff] made another phone call and g[o]t more upset and [took] it out on his officer."  (*Id.* ¶ 21.)  Plaintiff then said that that sort of behavior was "not his styl[e]" and that it was not "in his jacket [sic] to ever ac[t] like that."  (*Id.* ¶ 22.)  Plaintiff then said that sending him to the SHU was a "retaliation act [for] Plaintiff filing on staff" and that Munios "was tak[ing] this opportunity to place Plaintiff in the SHU."  (*Id.* (internal quotation marks omitted).)  Munios stated that, "even though [P]laintiff made it direct or indirect to the officer, he still heard it and took it the way he wanted."[2]  (*Id.* ¶ 23.)

At 7:20 pm that evening, Plaintiff was placed in the SHU, where he received a "false and fraudulent" incident report made by Conklin, which indicated that, upon asking Plaintiff for his ID card, Plaintiff responded in a very loud manner that Conklin (1) "need[ed] a reason to take it" and (2) was "fucking with the wrong guy."  (*Id.* ¶ 24 (internal quotation marks omitted).)  With regard to the first statement, Plaintiff concedes that he uttered these words but disputes that he said them in a loud manner.  (*See id.* ¶ 25.)  With respect to the second sentence, however, Plaintiff claims that Conklin "altered" his statement because "Plaintiff is a[n] African American" and, apparently consequently, "has never used the word [']guy['] in his vocabulary," and the relevant statement and conversation "was taking place among inmates, not inmates and officers."  (*Id.* ¶ 26.)

---

[2] The Court surmises that Plaintiff means to say that Munios told Plaintiff that, irrespective of whether his earlier described statement was made directly or indirectly to Conklin, Conklin still heard it and interpreted it as he did.

### 2.  Plaintiff's Run-in with Officer Magie

On March 11, 2014, the SHU lieutenant and officer refused to take Plaintiff to the shower, despite it being no more than ten feet from his cell.  (*Id.* ¶ 58.)  Magie, despite knowing that Plaintiff is handicapped, walks with a cane, and has a back injury and swollen feet, nonetheless refused to allow Plaintiff to use the closest shower and instead "intended to walk Plaintiff on the other[ ]side of the building without his cane."  (*Id.*)  Magie also refused to allow Plaintiff to use a "belly-chain" with the handcuffs, "which [Magie] intended to handcuff Plaintiff [with] behind his back."  (*Id.*)

Plaintiff refused to be "placed on the other side of the building" and to be cuffed from the back.  (*Id.*  ¶ 59.)  In response, Magie went ballistic, yelling, "This is [my] fucking house!  You have to do what I say to do!  Not the other way around!  You don't tell me what you want!  I tell you what I want!  I run things back here!  etc."  (*Id.*)  Plaintiff was then forced to wash up in the cell-sink of a "very severe freezing cell," in which Magie made him remain without clothing despite Plaintiff repeatedly saying that he was naked and freezing.  (*Id.* ¶ 60.)  Plaintiff called for the SHU lieutenant, but he did not answer, so Plaintiff banged on and kicked the SHU cell door.  (*See id.* ¶ 61.)  The lieutenant then came to the cell-door, where Plaintiff explained the situation to him.  (*Id.*)  The SHU lieutenant requested that the SHU officer provide Plaintiff with clothing, to which Magie responded that "he [would] get [the clothes] when he's ready[] because . . . Plaintiff [doesn't] run shit back here."  (*Id.* ¶ 62.)  Magie then continued to ignore Plaintiff's living conditions, instead walking by Plaintiff's cell without giving Plaintiff any clothing.  (*Id.* ¶ 63.)  Fifteen minutes later, Plaintiff kicked and banged on the cell door for the lieutenant's attention to show him that Magie still had not provided Plaintiff with clothing.  (*Id.*

¶ 64.)  As a result, the lieutenant then turned around and took clothing off of a cart across from

Plaintiff.  (*See id.*)[3]

### 3.  Plaintiff's Request to Make a Phone Call and Subsequent Transfer

At some point in 2014, Plaintiff received a letter from an attorney regarding civil action

settlement conditions.  (*Id.* ¶ 65.)  Plaintiff forwarded a request to Mr. Repecki ("Repecki"), the

unit manager, who told Plaintiff that he would instruct Mr. Demeo ("Demeo"), Plaintiff's

counselor, to provide Plaintiff with a legal phone call.  (*Id.*)

On the day Plaintiff was packing his property to prepare for his upcoming transfer from

Otisville to MDC Brooklyn, Plaintiff told Demeo that Repecki indicated that he would tell

Demeo that Plaintiff was to be allowed to place a call to an attorney.  (*Id.* ¶ 66.)  Demeo

responded that he just met with Repecki, who had said nothing about providing Plaintiff with a

legal call.  (*Id.*)  Demeo said that, in any event, Plaintiff was "outta here" and "[didn't] need any

m[]ore legal calls to the law firm of Reed Smith LLP."  (*Id.* ¶ 66.)

A week later, Plaintiff was transferred to MDC Brooklyn.  (*Id.*)  The legal proceedings

would be delayed for a month until Plaintiff reached his destination at F.C.I. Terre Haute.  (*Id.*)

### 4.  Plaintiff Pursues his Administrative Remedies with Respect to Conklin

Just over three weeks after Plaintiff was initially put in the SHU, on December 28, 2013,

he filed his "BP-8 informal resolution for the submi[ss]ion of a false incident report,

'official/legal' filing against . . . Plaintiff to the D-unit counselor, Mr. Demeo," which was then

submitted to Whinnery on December 30, 2013.[4]  (*Id.* ¶ 29; *see also* Pro Se Pl.'s Resp. to the

---

[3] The Amended Complaint is silent as to whether the lieutenant then handed these clothes
to Plaintiff.

[4] A BP-8 is the form used to indicate that an inmate has presented his issue formally to
staff.  *See Aguiar v. Laird*, No. 07-CV-1081, 2008 WL 795303, at *1 n.2 (E.D.N.Y. Mar. 24,

Government's Mot. To Dismiss ("Pl.'s Opp'n") ¶¶ 2–3 (Dkt. No. 28); Pl.'s Opp'n Ex. B. (BP-8

Form); Pl.'s Opp'n Ex. C (BP-8 Response).)[5]  Plaintiff was then called into an office where

Diehl was waiting for Plaintiff.  (Am. Compl. ¶ 30.)  Plaintiff then explained the incident, after

which time Diehl told Plaintiff that he had to wait for the "DHO" hearing before Plaintiff could

file a grievance against Conklin.  (*Id.*)[6]  Plaintiff said that the matter was not one for DHO but

rather was an "administrative matte[]r dealing with criminal conduct and acts by a[] United

States Government employee in official duties."  (*Id.*)  Plaintiff was then dismissed.  (*Id.* ¶ 31.)

In early January 2014, Plaintiff received Diehl's response to Plaintiff's BP-8, which said,

among other things, that allegations such as Plaintiff's are "taken seriously" and received "an

---

2008) ("Under 28 C.F.R. § 542.13(a), an inmate must present an issue for informal resolution
with a BP-8 form before he can make a formal request for administrative remedy through BP-
9."); *United States v. Lovaglio*, No. 05-CR-194, 2007 WL 2752369, at *1 (E.D.N.Y. Sept. 20,
2007) ("To appropriately exhaust administrative remedies, an inmate must . . . [f]irst . . . initiate
informal resolution by filing a 'BP-8' form." (citing, inter alia, 28 C.F.R. § 542.13(a)).

[5] Here and elsewhere in this recitation of the facts of the case, the Court periodically
draws on documents besides the Plaintiff's Amended Complaint.  "Although material outside a
complaint generally is not to be taken into consideration on a motion to dismiss, the policy
reasons favoring liberal construction of pro se complaints permit a court to consider allegations
of a pro se plaintiff in opposition papers on a motion where . . . consistent with the complaint."
*Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 246–47 (S.D.N.Y. 1998); *see also Anderson v. Buie*,
No. 12-CV-6039, 2015 WL 9460146, at *13 (W.D.N.Y. Dec. 23, 2015) (same); *Elliott v. Nestle
Waters N. Am. Inc.*, No. 13-CV-6331, 2014 WL 1795297, at *7 (S.D.N.Y. May 6, 2014)
(considering, among other things, exhibits attached to the plaintiff's opposition brief in part "in
light of the policy permitting courts to consider facts alleged for the first time in a pro se
plaintiff's opposition to a motion to dismiss" (italics omitted)).  On the other side of the coin, the
Court declines to consider reiterations of the factual allegations submitted, for instance, in
Plaintiff's late December 2015 submission entitled "Pro Se Plaintiff's Response And Sanction
for Spoliation of Evidence Motion to the Defendant[s'] Memorandum of Law in Response to
Plaintiff's Motion to Preserve Evidence."  (*See* Dkt. No. 48.)  Daunting though it no doubt is for
pro se plaintiffs to prosecute their claims in court without counsel, the practical and
accommodating rationales underlying the policy of liberally construing their submissions do not
also militate in favor of the courts attempting to draw a line of best fit through all of a plaintiff's
recitations of the facts of the case, wherever they may be found in the record.

[6] This appears to be a reference to the Discipline Hearing Officer hearing described at 28
C.F.R. § 541.8

appropriate amount of review" but that, "[d]ue to the privacy interest of the staff member which

[Plaintiff] name[d], [the Bureau of Prisons] [was] unable to disclose to [Plaintiff] any findings or

the result o[f] [the Bureau's] review of th[e] matter."  (*Id.*; *see also* Pl.'s Opp'n ¶ 3; Pl.'s Opp'n

Ex. C (BP-8 Response).)  Afterwards, Conklin returned to work on his regular schedule and

continued to target Plaintiff with "pat-searches" and "verbal com[m]ents degrading Plaintiff's

effort[s] of filing his administrative remedy grievances."  (Am. Compl. ¶ 32.)  That same day,

Plaintiff submitted his BP-9 administrative remedy to Dachisen, who turned Plaintiff's BP-9

over to Special Investigative Services ("SIS") instead of the administrative remedy coordinator

for the facility.  (*Id.* ¶ 33; *see also* Pl.'s Opp'n ¶ 4; Pl.'s Opp'n Ex. D (BP-9 Form and

Response).)[7]

A few weeks later, Hickman summoned Plaintiff to the lieutenant's office to address his

BP-9 grievance form.[8]  (Am. Compl. ¶ 34.)  Plaintiff explained that, if Conklin were to continue

to work in the unit, Plaintiff wished to exhaust his administrative remedies because it was clear

to him that the prison administration had no intention of ever remedying Conklin's submission of

fraudulent and misleading incident reports.  (*See id.*)  Hickman said that he would "forward the

process[] and give his response" so that Plaintiff could continue to exhaust his administrative

remedies.  (*Id.* ¶ 35.)

On February 12, 2014, Recktenwald responded to Plaintiff's BP-9, stating that, "[o]n

December 10, 2013, the UDC found [Plaintiff] committed [Code] 312, Insolence Towards a Staff

---

[7] Plaintiff actually says "SIS" rather than "Special Investigative Services," but it appears
that that is the component to which he refers.  *See Anderson v. Marr*, No. 10-CV-818, 2011 WL
3423694, at *1 n.4 (S.D.N.Y. July 18, 2011), *adopted by* 2011 WL 3585968 (S.D.N.Y. Aug. 10,
2011).

[8] Plaintiff here refers to "Lieutenant Mr. D. Hickerman," but it appears that Plaintiff
intended to refer to Hickman.

Member and sanctioned, accordingly" and that "[a]dditionally, [Plaintiff] also admitted that [he] made the statement in reference to the staff member." (*Id.* ¶ 41; *see also* Pl.'s Opp'n ¶ 5; Pl.'s Opp'n Ex. E (BP-9 Response).)[9]  Since then, the Otisville administration has "refus[ed] to address and avoid the submission of [a] fraudulent incident report of being in an [u]nauthorized [a]rea which gave rise to Plai[]ntiff's statement made to fellow inmates and not to staff directly or indirectly." (*See* Am. Compl. ¶ 42.)  Rather, "Conklin read [the BP-9] [as] allowing [him] to believe he had the green light to do as he pleased without the [fear] of any interference from his co-workers, commanding officer[]s[,] and administration/warden." (*Id.*)

Sometime around February 16 or 17, 2014, Conklin, who was assigned to Unit D-B for the quarter, called Plaintiff to come retrieve his mail. (*See id.* ¶ 36.)  About 15 to 30 minutes after Plaintiff did so and returned to his living area, Conklin called Plaintiff to an office where Conklin "with a sm[i]rk on his face" handed Plaintiff his BP-9. (*Id.*)  About 30 minutes later, Conklin walked out of his office, directly to Plaintiff's living area, and started searching. (*Id.* ¶ 37.)  Conklin made two or three more visits to Plaintiff's living area that same night. (*Id.*)  At the 5:00 pm call for insulin, Conklin waited outside the Unit D-B doors where he stopped Plaintiff and questioned him about his double mattress that Plaintiff had had since before Conklin began working there. (*Id.* ¶ 38.)  "Upon return back to [the] D-B unit[,] . . . Conklin stood outside the entrance to D-B from the D-A unit [and] . . . threatened . . . Plaintiff[,] stating[,] 'if you don't put that second mattress in[ ]front of my office[,] you will be going to the SHU.'" (*Id.*)  Plaintiff then immediately took the mattress off his bed and put it in front of Conklin's

---

[9] As an exhibit to his Opposition to Defendants' Motion, Plaintiff also attaches a response apparently from Hickman, dated February 7, 2014. (*See* Pl.'s Opp'n Ex. D (BP-9 Form and Response) at unnumbered 3.)  It provides somewhat more detail than Recktenwald's response, but it does not reach a contrary conclusion. (*See id.*)

office.  (*Id.* ¶ 39.)  That night, Conklin "repeatedly made his rounds stric[t]ly at Plaintiff's living area."  (*Id.* ¶ 40.)

On February 20, 2014, Plaintiff filed a "Notice of Motion for Restraining O[r]der against [Bureau of Prisons ("BOP")] staff employee at [Otisville], on . . . Conklin for har[]assment, which was being done with malicious intent[] [t]o the United States District Court sentencing Judge[] William C. Griesbach, to the United States Attor[ne]y General, Eric Holder, Jr., and to the B[OP] Regional O[]ffice."  (*Id.* ¶ 43; *see also* Pl.'s Opp'n ¶ 16; Pl.' Opp'n Ex. P. (E.D. Wis. Mot.); Pl.'s Opp'n Ex. V (E.D. Wis. Mot.).)[10]  On February 24, 2014, Plaintiff also filed a complaint of reprisal and abridgment of rights to redress.  (Am. Compl. ¶ 44.)  The next day, the Otisville administration received its copy of the restraining order motion, and, at 9 am, Plaintiff was escorted to an office where he was stripped, had pictures of his body taken, and was handcuffed before being brought to the SHU.  (*Id.* ¶ 45.)  Plaintiff was processed into the SHU after Hickman and Susney waited for Plaintiff to provide "an affidavit stating the reason why Plaintiff filed his motion."  (*Id.* ¶ 46.)  Susney told Plaintiff that he would receive a copy of his signed affidavit; however, he did not, and, upon Plaintiff's transfer from Otisville, Susney told him that he "[could] not rec[ei]ve a copy of his own affidavit" "because it involve[d] staff."  (*Id.*)

In March 2014, Plaintiff filed a "complaint of reprisal/abridgment of right to redress Plaint[]iff's filing complaint of retaliation."  (*Id.* ¶ 47.)  "Stating that at around 9:15 or 9:30am, Plaintiff [was] es[]corted off the F.C.I. Otisville compound and [was] place[d] in the SHU for

---

[10] The court denied Plaintiff's motion, noting that Plaintiff was "expected and required to exhaust administrative remedies" and that "th[e] court ha[d] no jurisdiction over the bureau of prisons as it applies in this case."  (Pl.'s Opp'n Ex. R (E.D. Wis. Order); *see also* Pl.'s Opp'n ¶ 18.)

filing complaint."[11]  (*Id.* ¶ 48.)  Plaintiff was then placed in a freezing cell without heat at a
"[temperature] way below zero" and windows that were open, broken, and could not be closed.
(*Id.* ¶ 49.)  "Plaintiff also stated that he was without shoes on a cold ic[]y floor with only one pair
of socks on his feet for two whole days until the warden walked by doing their [sic] SHU
rounds."  (*Id.* ¶ 50.)  Finally, on April 14, 2014, Plaintiff submitted a Central Office
Administrative Remedy Appeal to the BOP, to which he received a response on October 28,
2014.  (*See* Pl.'s Opp'n ¶ 1; Pl.'s Opp'n Ex. A (Office of General Counsel Appeal).)

### 5.  Plaintiff's Other Complaints

In his Amended Complaint and Opposition to Defendant's Motion, Plaintiff also alleged
he raised other issues with various prison and other governmental officials.

First, and apparently not directly connected with his claims in this case, Plaintiff
complained that he believed the prison was tampering with his mail.  (*See* Pl.'s Opp'n ¶ 6; Pl.'s
Opp'n Ex. F (Letter from M. Whinnery to Plaintiff (Sept. 30, 2013)).)

Additionally, by letter dated February 24, 2014, Plaintiff requested that Attorney General
Eric Holder and a component of the Department of Justice issue a restraining order against
Conklin and suspend him without pay for 60 days because, Plaintiff asserted, Conklin harassed
him and retaliated against him.  (*See* Pl.'s Opp'n Ex. O (Letter from Pl. to "Special Investigation
Attorney General" (Feb. 24, 2014)); *see also* Pl.'s Opp'n ¶ 15.)

---

[11] Taking this allegation by itself, it would be unclear to the Court whether Plaintiff
meant to say that he was thereafter placed in the SHU for filing his March 2014 complaint, or
that he stated in his March 2014 complaint that he had been put in the SHU for making earlier
complaints.  However, the attachments to Plaintiff's Opposition to Defendants' Motion to
Dismiss make clear that Plaintiff spent additional time in this SHU in March 2014.  (*See* Pl.'s
Opp'n Ex. H (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)) ("I'm being held in this
SHU against all that is right . . . .").)

Several days later, on February 26, 2014, at around 12:30 pm, the warden, "both A.W's Captain," the health service administrator, warden assistant, and the unit manager for D-Unit were made aware of Plaintiff's living conductions in cell #209 of the SHU.  (Am. Compl. ¶ 52.) Additionally, on March 4, 2014, Plaintiff wrote a "notice" to Recktenwald, which was submitted to her the next day.  (*Id.* ¶ 53; *see also* Pl.'s Opp'n ¶ 7; Pl.'s Opp'n Ex. G (Letter from Pl. to Warden (Mar. 4, 2014)).)  That notice addressed four issues:  (1) that Plaintiff signed an affidavit on February 24, 2014 with Susney but had not yet received a copy of it despite repeatedly asking for one; (2) that Plaintiff wears hand braces for both hands but that neither the SHU nor the medical staff had replaced a set as promised on February 25, 2014; (3) that there was no heat in Plaintiff's cell, which, with all the windows being either open or broken, made the experience akin to being outside at night in the middle of a blizzard when the temperature is fifteen degrees below zero, causing Plaintiff's feet, toes, and hands to be frozen ever since he was placed in the SHU; (4) that Plaintiff is being "subjected to cruel and unusual punishment by [her] administration" and that Plaintiff was "placing [her] on notice with this document of this deliberate indifference, cruel and unusual punishment[,] . . . reprisal[,] and abridgment of [Plaintiff's] right to redress and grieve an injustice acts [sic] upon [his] person."  (*See* Am. Compl. ¶ 53; Pl.'s Opp'n Ex. G (Letter from Pl. to Warden (Mar. 4, 2014)).)[12]

Next, Plaintiff submitted a letter dated February 27, 2014 to "special investigation attorney general," in the Civil Rights Division's Special Litigation Section at the Department of

---

[12] Here and elsewhere, there are slight discrepancies between how Plaintiff describes the content of his letters in his Amended Complaint and those letters as they appear when attached as exhibits to his Opposition to Defendants' Motion.  (*Compare, e.g.*, Am. Compl. ¶ 53 *with* Pl.'s Opp'n Ex. G (Letter from Pl. to Warden (Mar. 4, 2014)).)  Those differences are, however, inconsequential and will not be further noted going forward.  It should be noted, however, that a tie goes to the documents.

Justice complaining about, among other things, the fact that Plaintiff was photographed by the compound officer, that his cell was freezing, that Plaintiff was not permitted a pair of medical shoes, that he does not have hand braces, and that he was being retaliated against.  (*See generally* Pl.'s Opp'n Ex. Q (Feb. 27, 2014 complaint packet); *see also* Pl.'s Opp'n ¶ 17.)  Although it is unclear whether it relates to Plaintiff's February 27 letter, Plaintiff received a letter dated April 3, 2014 from Jonathan Smith, chief of the Special Litigation Section of the Department of Justice, thanking him for his letter and indicating that the section "d[id] not have the resources to follow-up [sic] on every letter," but he "[would] review [Plaintiff's] letter to decide whether it [was] necessary to contact [Plaintiff] for additional information."  (Pl.'s Opp'n Ex. S (Letter from Jonathan Smith to Pl. (Apr. 3, 2014)), at unnumbered 1; *see also* Pl.'s Opp'n ¶ 19.)  The letter stressed that "[t]he Special Litigation Section only handles cases that arise from widespread problems that affect groups of people" and that it could not "assist with individual problems" or "help [inmates] recover damages or any personal relief."  (Pl.'s Opp'n Ex. S (Letter from Jonathan Smith to Pl. (Apr. 3, 2014)), at unnumbered 1.)  In a separate letter dated April 3, 2014, also from Jonathan Smith, the Special Litigation Section informed Plaintiff that it "d[id] not have jurisdiction in [Plaintiff's] matter" but "believe[d] that authority for handling this matter may rest with the Federal Bureau of Prisons" to whom it would refer the matter.  (Pl.'s Opp'n Ex. T (Letter from Jonathan M. Smith to Pl. (Apr. 3, 2014)); *see also* Pl.'s Opp'n ¶ 20.)  That letter was sent to the BOP by letter dated April 3, 2014, which, in turn, informed Plaintiff on May 20, 2014 that a review of it revealed that it contained issues that should first be brought to the attention of prison staff.  (*See* Pl.'s Opp'n Ex. Q (Feb. 27, 2014 complaint packet) at unnumbered 1–3.)

On March 5, 2014, Plaintiff also "placed the warden on notice" that he was being prevented from using the phone as needed, that he was not housed in the SHU for breaking any

BOP policies, and that it was "cruel and unusual punishment" and "deliberate indifference" to be subjected to cold confinements yet not charged with a crime or violation.  (*See* Am. Compl. ¶ 54; *see also* Pl.'s Opp'n ¶ 13; Pl.'s Opp'n Ex. M (Letter from Pl. to Warden (Mar. 5, 2014)).)  That same day, Plaintiff wrote a letter addressed to Mary Patrice Breun at the Department of Justice, complaining of a number of issues, including that he had a freezing cell, was not permitted to wear his medical shoes, needs to wear hand braces, was forced to give up his mattress, and was retaliated against.  (*See generally* Pl.'s Opp'n Ex. N (Letter from Pl. to Mary Patrice Breun (Mar. 5, 2014)); *see also* Pl.'s Opp'n ¶ 14.)

At the breakfast serving the following day, Plaintiff contacted the SHU lieutenant and informed him that Plaintiff was in the SHU "right now for a restraining order against . . . Conklin and 'for [his] protection' as SIS claim [sic]," but that "the same officer [was] at [the] door feeding [Plaintiff]"  (*See* Am. Compl. ¶ 56; Pl.'s Opp'n Ex. K (Letter from Pl. to SHU lieutenant (Mar. 6, 2014)); *see also* Pl.'s Opp'n ¶ 11.)  Also on March 6, Plaintiff submitted a letter to the SHU lieutenant complaining that he had not yet received a copy of his signed affidavit.  (*See* Pl.'s Opp'n ¶ 9; Pl.'s Opp'n Ex. I (Letter from Pl. to SHU lieutenant (Mar. 6, 2014)).)

Additionally, the next morning, Plaintiff submitted to the SHU lieutenant a request to make more than one phone call, on the grounds that he was not placed in the SHU for breaking BOP policies.  (*See* Am. Compl. ¶ 55; Pl.'s Opp'n Ex. L (Letter from Pl. to SHU lieutenant (Mar. 7, 2014)); *see also* Pl.'s Opp'n ¶ 12.)

On March 9, 2014, Plaintiff submitted a letter requesting to speak to Susney, who, the letter said, was on duty at that time.  (Pl.'s Opp'n ¶ 10; Pl.'s Opp'n Ex. J (Letter from Pl. (March 9, 2014)).)  On March 11, 2014, Plaintiff wrote a note directed to Demeo indicating that Plaintiff "need[ed] to talk to [Demeo] about being authorized to have a third (3rd) box of legal documents

transferred with [Plaintiff] and [his] property." (Pl.'s Opp'n Ex. W (Letter from Plaintiff to Demeo (Mar. 11, 2014)) (emphasis omitted).) Finally, on March 12, 2014, Plaintiff again informed the warden that he was "being hindered from contacting his lawyers[] [and] making a legal call" by virtue of the fact that he was being held in the SHU despite not violating any BOP policies and that he was "restricted" in his normal activities and was "subjected to one call every 30 days." (*See* Am. Compl. ¶ 57; Pl.'s Opp'n Ex. H (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)); Pl.'s Opp'n Ex. X (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)) *see also* Pl.'s Opp'n ¶ 8.)

    B.  Procedural History

        On September 29, 2014, Plaintiff brought suit against Conklin, Dachisen, Diehl, Hickman, Recktenwald, Susney, Whinnery, the United States of America, and a number of John and Jane Doe defendants, and, in that Complaint, requested the appointment of counsel. (Dkt. No. 1.) That same day, Plaintiff requested to proceed in forma pauperis ("IFP"), (Dkt. No. 2), and file a motion entitled "Complaint Supplemental 'Emergency Ex Parte' Motion to Preserve Evidence," (Dkt. No. 4), which the Court denied without prejudice until Plaintiff served Defendants, (Dkt. No. 8). Plaintiff also moved to vacate the order granting his IFP status, (Dkt. No. 5), relief the Court granted shortly on December 1, 2014, (Dkt. No. 6). On December 10, 2014, the Court denied Plaintiff's request for the appointment of counsel without prejudice. (Dkt. No. 9.)

        On April 9, 2015, Plaintiff filed an Amended Complaint against Conklin, Dachisen, Diehl, Susney, Hickman, Recktenwald, Whinnery, Miraglia, Magie, and the United States of America. (Dkt. No. 22.) The next day, Defendants submitted a pre-motion letter in advance of their Motion to Dismiss, (Dkt. No. 19), and the Court set a briefing schedule for that Motion,

(Dkt. No. 21).  On May 20, 2015, Defendants filed their Motion to Dismiss and accompanying papers, (Dkt. Nos. 23–27); Plaintiff filed his opposition on June 25, 2015, (Dkt. No. 28); and Defendants filed their Reply on July 14, 2015, (Dkt. No. 29).  On August 4, 2015, Plaintiff filed (1) a document entitled "Pro Se Plaintiff's Sworn Affidavit in Support of Response to Defendant's Motion to Dismiss Amended Complaint Sworn Affidavit of Plaintiffs' [sic] Proof of PLRA Compliance," and (2) a Motion entitled "Complaint Supplemental '[E]mergency Ex Parte' Motion to Preserve Evidence," which sought preservation of certain video footage and logbooks.  (Dkt. Nos. 31–32.)  On August 21, 2015, Defendants filed their opposition to this latter Motion, along with accompanying papers.  (Dkt. Nos. 34–35.)  On September 2, 2015, Plaintiff filed a document entitled "Pro Se Motion for Release Detained Legal Document[]s/Access to Law[ ]Library," (Dkt. No. 37), to which Defendants responded on September 10, 2015, (Dkt. Nos. 38–39), and upon which the Court ruled on September 10, 2015, (Dkt. No. 40), and as to which it clarified its ruling on September 18, 2015 (Dkt. No. 44).

On December 9, 2015 Plaintiff filed a document entitled "Motion for Release of Legal Property/Documents and Access to Law-Library," (Dkt. No. 46), to which Defendants responded on December 30, 2015, (Dkt. Nos. 49–52).  Additionally, on December 22, 2015, Plaintiff filed a document entitled "Pro Se Plaintiff's Response and Sanction for Spoliation of Evidence Motion to the Defendant[]s['] Memorandum of Law in Response to Plaintiff's Motion To Preserve Evidence,"  (Dkt. No. 48), comprising a belated reply in support of his earlier motion for preservation of documents and a request for an adverse inference relating to that same documents.  Subsequently, Plaintiff, characterizing Defendants' December 30, 2015 opposition as a "motion," requested on January 20, 2016 an additional 30 days to respond, so that he could "submit exhibits" and "reach access to the SHU Law Library," (Dkt. No. 53), relief the Court

denied on January 22, 2016, on the grounds that a reply was not necessary, (Dkt. No. 54).

Shortly thereafter, Defendants, noting a new argument raised in Plaintiff's reply, sought leave to

file a sur-reply on February 11, 2016, (Dkt. No. 58), which the Court granted the same day, (Dkt.

No. 59).  Defendants then filed their sur-reply.  (Dkt. Nos. 61–64.)

 Additionally, on February 5, 2016, Plaintiff filed without permission a 105-page motion,

entitled "Pro Se Plaintiff [sic] Motion for Leave to File Supplemental Pleadings [sic] Pursuant to

Federal Rules [sic] of Civil Procedure 15(d) & Response to the Government Motion to Dismiss,"

(Dkt. 55), which the Court noted appeared to lack relevance to this lawsuit, and granting Plaintiff

permission to submit an explanation in a two-page letter by February 29, 2016, (Dkt. No. 57).

Pursuant to Plaintiff's requests, (Dkt. Nos. 65, 67), the Court granted Plaintiff two final

extensions, (Dkt. Nos. 66, 68).

## II.  Discussion

### A.  Standard of Review

 "The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject

matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.'"

*Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn.

June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)); *see also*

*Neroni v. Coccoma*, No. 13-CV-1340, 2014 WL 2532482, at *4 (N.D.N.Y. June 5, 2014) (same),

*aff'd*, 591 F. App'x 28 (2d Cir. 2015).  "In deciding both types of motions, the Court must accept

all factual allegations in the complaint as true, and draw inferences from those allegations in the

light most favorable to the plaintiff."  *Gonzalez*, 2014 WL 2475893, at *2 (internal quotation

marks omitted); *see also Seemann v. U.S. Postal Serv.*, No. 11-CV-206, 2012 WL 1999847, at *1

(D. Vt. June 4, 2012) (same).  However, "[o]n a Rule 12(b)(1) motion, . . . the party who invokes

the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction

exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule

12(b)(6)." *Gonzalez*, 2014 WL 2475893, at *2; *see also Sobel v. Prudenti*, 25 F. Supp. 3d 340,

352 (E.D.N.Y. 2014) ("In contrast to the standard for a motion to dismiss for failure to state a

claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of

proving by a preponderance of the evidence that it exists." (internal quotation marks omitted)).

This difference as to the allocation of the burden of proof is "[t]he only substantive difference"

between the standards of review under these two rules. *Smith v. St. Luke's Roosevelt Hosp.*, No.

08-CV-4710, 2009 WL 2447754, at *9 n.10 (S.D.N.Y. Aug. 11, 2009), *adopted by* 2009 WL

2878093 (S.D.N.Y. Sept. 2, 2009); *see also Fagan v. U.S. Dist. Court for S. Dist. of N.Y.*, 644 F.

Supp. 2d 441, 446–47 & n.7 (S.D.N.Y. 2009) (same).

### 1.  Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has

authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233,

241 (E.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Arar v. Ashcroft*, 532 F.3d 157,

168 (2d Cir. 2008), *vacated and superseded on reh'g on other grounds*, 585 F.3d 559 (2d Cir.

2009) (en banc)).  "Determining the existence of subject matter jurisdiction is a threshold

inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule

12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."

*Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks

omitted), *aff'd*, 561 U.S. 247 (2010); *see also N.Y. State Citizens' Coal. for Children v. Carrion*,

31 F. Supp. 3d 512, 516 (E.D.N.Y. 2014) (same).

### 2.  Rule 12(b)(6)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alterations,

citations, and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked

assertions devoid of further factual enhancement."  *Id.* (internal quotation marks and alterations

omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief

above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the

line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556

U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense. But where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R.

Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-

technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a

plaintiff armed with nothing more than conclusions.").

For the purposes of Defendants' Motion To Dismiss, the Court is required to consider as true the factual allegations contained in the Amended Complaint. *See Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)); *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) (same). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). Moreover, it is appropriate to consider statements made by Plaintiff "submitted in response to a defendant[']s request for a pre-motion conference" for the purpose of resolving the instant Motion. *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013). Finally, the Court construes "the submissions of a pro se litigant . . . liberally" and interprets them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and some italics omitted).

### B.  Analysis

Defendants have moved to dismiss portions of Plaintiff's claims on a variety of grounds. The Court will address each in turn.

#### 1.  Claims against the United States

In his Amended Complaint, Plaintiff names the United States of America as a defendant, (*see* Am. Compl. 1), and, further, specifies that he brings suit against "the above Defendant(s) . . . acting in their official and in their individual capacities," (*id.* at 2). Defendants,

however, argue (1) that Plaintiff's claims against the individual Defendants in their official capacities are also considered suits against the United States, (Mem. of Law of Defs. in Supp. of their Mot. To Dismiss the Am. Compl. ("Defs.' Mem.") 20 (Dkt. No. 24)), (2) that the United States has not waived sovereign immunity for constitutional torts, (*id.*), and (3) that, to the extent that Plaintiff tries to allege a tort claim, it fails for failure to exhaust his administrative remedies under the Federal Tort Claims Act ("FTCA"), (*id.* at 20–21 n.8).  Plaintiff responds that, while he has "show[n] . . . that all 4-[ph]ases of exhaustion under [the Prison Litigation Reform Act] w[]ere completed, the retaliat[ory] transfer of Plaintiff deter[r]ed his exhaustion to the Federal Tort Claim Act § 2671 filing."  (Pl.'s Opp'n 29.)  Therefore, the Court is faced with two questions: (1) can Plaintiff bring a *Bivens* claim against the individual Defendants in their official capacities; and (2) does the FTCA's administrative exhaustion requirement bar Plaintiff's suit?

### a.  *Bivens* Official Capacity Claims

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (internal quotation marks omitted); *see also Diaz v. United States*, 517 F.3d 608, 611 (2d Cir. 2008) (same).  "The waiver of sovereign immunity is a prerequisite to subject matter jurisdiction."  *Presidential Gardens Assocs. v. U.S. ex rel. Sec. of Hous. & Urban Dev.*, 175 F.3d 132, 139 (2d Cir. 1999).  "[W]aivers of sovereign immunity must be 'unequivocally expressed' in statutory text, and cannot simply be implied."  *Adeleke v. United States*, 355 F.3d 144, 150 (2d Cir. 2004) (quoting *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33 (1992)).  Moreover, a plaintiff bears the burden to demonstrate that sovereign immunity has been waived.  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("[T]he plaintiff bears the burden of establishing that [his or] her claims fall within an applicable waiver.").

"The United States has not waived its sovereign immunity with respect to claims that its employees have committed constitutional torts." *Alston v. Sebelius*, No. 13-CV-4537, 2014 WL 4374644, at *8 (E.D.N.Y. Sept. 2, 2014) (quoting *Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994)). Accordingly, "*Bivens* claims do not lie against federal employees in their official capacities, because such suits are considered actions against the United States, and are barred by the doctrine of sovereign immunity." *Wright v. Condit*, No. 13-CV-2849, 2015 WL 708607, at *1 (S.D.N.Y. Feb. 18, 2015) (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994)); *see also Gonzalez v. Shahnoon*, No. 15-CV-2961, 2015 WL 6118528, at *4 (E.D.N.Y. Oct. 16, 2015) ("*Bivens* claims against federal officials in their official capacity are barred by the sovereign immunity doctrine."). Therefore, to the extent that Plaintiff (1) brings a *Bivens* claim against the individual defendants in their official capacities, or (2) a tort claim against the United States directly, his claim is barred by the doctrine of sovereign immunity and must therefore be dismissed.

### b.  FTCA Official Capacity Claims

The same is not true, however, with respect to any claims that Plaintiff brings pursuant to the FTCA. Before delving into why that is so, the Court notes that it is less than entirely clear what Plaintiff's putative FTCA claim is. In the section of their Memorandum of Law in support of their Motion to Dismiss identifying Plaintiff's claims, Defendants do not even list an FTCA claim, (*see* Defs.' Mem. 10)—and seemingly for good reason:  the only hints that Plaintiff attempts to bring such a claim are stray allusions to the FTCA or the "tort claim act" in the Amended Complaint's cover page or sections concerning venue and subject matter jurisdiction, (*see* Am. Compl. 1, 3), and his assertion for the first time in his Opposition that he was

"deter[r]ed" from exhausting his FTCA claim, (Pl.'s Opp'n 29).  Nevertheless, for the reasons

that follow, whatever Plaintiff's FTCA claim consists of, the Court lacks jurisdiction over it.

In enacting that statute, Congress created a "limited waiver by the United States of its

sovereign immunity and allows for a tort suit against the United States under specified

circumstances." *Liranzo v. United States*, 690 F.3d 78, 85 (2d Cir. 2012) (quoting *Hamm v.*

*United States*, 483 F.3d 135, 137 (2d Cir. 2007)); *see also Regnante v. Sec. & Exch. Officials*,

No. 14-CV-4880, 2015 WL 5692174, at *13 (S.D.N.Y. Sept. 28, 2015) (same).  An FTCA action

"against the United States is the exclusive remedy for a suit for damages for injury resulting from

the negligent or wrongful act or omissions of any employee of the Government while acting

within the scope of his office or employment." *Bearam v. Sommer,* No. 12-CV-1858, 2013 WL

5405492, at *8 (S.D.N.Y. Sept. 25, 2013) (internal quotation marks omitted) (citing, *inter alia,*

28 U.S.C. § 2679(b)(1)); *see also Finley v. Hersh*, No. 12-CV-162, 2013 WL 3450270, at *7 (D.

Vt. July 9, 2013) ("As to [the plaintiff's] tort claims, his exclusive remedy for monetary damages

against the United States is under the Federal Tort Claims Act.").

When bringing an FTCA claim, plaintiffs are required to first exhaust their administrative

remedies.  *See, e.g.*, *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d

Cir. 2005) ("The FTCA requires that a claimant exhaust all administrative remedies before filing

a complaint in federal district court."); *Morrow v. Dupont*, No. 08-CV-3083, 2010 WL 1005856,

at *3 (E.D.N.Y. Mar. 15, 2010) (same); *see also* 28 U.S.C. § 2675(a) ("An action shall not be

instituted upon a claim against the United States for money damages for . . . personal

injury . . . caused by the negligent or wrongful act or omission of any employee of the

Government while acting within the scope of his office or employment, unless the claimant shall

have first presented the claim to the appropriate Federal agency and his claim shall have been

finally denied by the agency in writing and sent by certified or registered mail.").  The FTCA's exhaustion requirement is "jurisdictional and cannot be waived."  *Celestine*, 403 F.3d at 82; *see also Bastien v. Samuels*, No. 14-CV-1561, 2015 WL 5008837, at *2 (E.D.N.Y. Aug. 21, 2015) (same); *R.C.L. Infant v. Bronx-Lebanon Hosp. Ctr.*, No. 13-CV-6764, 2015 WL 1499745, at *4 (S.D.N.Y. Mar. 31, 2015) (same).[13]  "The plaintiff bears the burden of pleading compliance with the FTCA's exhaustion requirement."  *Sherman-Amin-Braddox:Bey v. McNeil*, No. 10-CV-5340, 2011 WL 795855, at *2 (E.D.N.Y. Feb. 25, 2011) (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 210, 214 (2d Cir. 1987)); *accord Foster v. Fed. Emergency Mgmt. Agency*, No. 14-CV-1750, 2015 WL 5430370, at *10 (E.D.N.Y. Sept. 15, 2015) (same); *Bastien*, 2015 WL 5008837, at *5 (same); *see also Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) ("The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence.").  "With respect to claims against the BOP, the FTCA requires that an inmate mail or deliver his or her claim to the BOP's Regional Office, and then to appeal an adverse decision in writing to the BOP prior to filing suit in U.S. District Court."  *Lockwood v. Fed.*

---

[13] The Supreme Court has recently held that the FTCA's time limits for filing an administrative claim and bringing suit in federal court are not jurisdictional.  *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1629 (2015).  However, "the Court's opinion did not address—and therefore did not disturb—the well-established principle that . . . exhaustion of administrative remedies[] [is] jurisdictional in nature, and [is] not subject to waiver . . . ." *Mohamed v. F.B.I.*, No. 14-CV-7615, 2015 WL 6437369, at *6 (S.D.N.Y. Oct. 21, 2015); *see also Barnhill v. Terrell*, 616 F. App'x 23, 25 & n.1 (2d Cir. 2015) (concluding that "[Plaintiff] failed to exhaust his administrative remedies, and that it accordingly lacked jurisdiction to hear his FTCA claims" but noting that in *Kwai Fun Wong*, "the U.S. Supreme Court ruled that time limitations under the FTCA are nonjurisdictional and subject to equitable tolling"); *cf. Ortega v. Colvin*, No. 13-CV-3487, 2015 WL 6143591, at *4 (E.D.N.Y. Oct. 19, 2015) (noting the holding in *Kwai Fun Wong* but also indicating that "[t]he administrative exhaustion requirement [of the FTCA] derives from a cardinal principle of law—that the United States, as sovereign, is immune from suits in the courts of law" and that "[s]overeign immunity creates a jurisdictional bar to suit" (internal quotation marks omitted)).

*Bureau of Prisons*, No. 13-CV-8104, 2015 WL 4461597, at *2 (S.D.N.Y. July 21, 2015) (citing

28 C.F.R. §§ 543.31(c), 543.32(g)).

Here, Plaintiff has not attempted to plead or argue that he complied with the FTCA's

exhaustion requirement.  To the contrary, he argues that he was "deter[r]ed" from exhausting his

FTCA claim.  (Pl.'s Opp'n 29.)  That is not the same thing, and, so, this Court simply does not

have jurisdiction to entertain Plaintiff's FTCA claim, to the extent one even is to be found in the

Amended Complaint.  *See Sherman-Amin-Braddox:Bey*, 2011 WL 795855, at *2 (noting that

"[t]he plaintiff bears the burden of pleading compliance with the FTCA's exhaustion

requirement").[14]  However, Plaintiff's claims are dismissed without prejudice, and Plaintiff is

granted leave to file a Second Amended Complaint within 30 days of this Opinion.

Consequently, if Plaintiff has exhausted his administrative remedies pursuant to the FTCA by

that time, he may assert his FTCA claim in his Second Amended Complaint.  *See Vitrano v.

United States*, No. 06-CV-6518, 2008 WL 1752221, at *4 (S.D.N.Y. Apr. 16, 2008) ("When and

if [the plaintiff] is able to plead satisfaction of jurisdictional prerequisites [of his FTCA claim],

he will be entitled to assert these claims either by amending his complaint here or by filing a new

---

[14]  Nor would it be an answer (to the extent that it is even true) that Plaintiff exhausted his remedies under the Prison Litigation Reform Act ("PLRA"), to be discussed shortly.  To be sure, in his Opposition, Plaintiff periodically refers to the "Federal Tort Claims Act," when context suggests he intended to refer to the PLRA.  (*See, e.g.*, Pl.'s Opp'n 15.)  However, "[t]he exhaustion procedures under the two statutes differ, and the fulfillment of one does not constitute satisfaction of the other."  *Owusu v. Fed. Bureau of Prisons*, No. 02-CV-915, 2003 WL 68031, at *2 (S.D.N.Y. Jan. 7, 2003) (footnote omitted); *see also Ward v. Ives*, No. 11-CV-1657, 2014 WL 4417764, at *6 (E.D. Cal. Sept. 4, 2014) ("Prison grievances are not sufficient to exhaust administrative remedies under the FTCA because exhaustion requirements for administrative remedies through the BOP's inmate grievance system differ from the exhaustion requirements for filing a claim under the FTCA." (alterations and internal quotation marks omitted)), *adopted by* 2014 WL 4929454 (E.D. Cal. Sept. 30, 2014); *Robinson v. United States*, No. 13-CV-1106, 2014 WL 2940454, at *6 (M.D. Pa. June 30, 2014) ("[A]n inmate may not rely upon the submission of prison grievances to satisfy his separate and independent exhaustion requirement under the FTCA.")

action.").  To the extent that Plaintiff has exhausted such remedies but his FTCA claim is

nonetheless untimely, *see* 28 U.S.C. § 2401(b), he is free to allege facts sufficient to argue that

that untimeliness should be forgiven under the doctrine of equitable tolling, *see Palmer-Williams*

*v. United States*, No. 14-CV-9260, 2016 WL 676465, at *3 (S.D.N.Y. Feb. 18, 2016) (noting that

"the U.S. Supreme Court recently ruled that time limitations under the FTCA are

nonjurisdictional and therefore subject to equitable tolling" (citing *United States v. Kwai Fun*

*Wong*, 135 S. Ct. 1625, 1633 (2015)))—particularly if, as he says, he was "deter[r]ed" in

exhausting his administrative remedies, (Pl.'s Opp'n 29).

### 2.  PLRA Failure to Exhaust

Defendants also argue that Plaintiff has failed to administratively exhaust the bulk of his

claims—indeed, all of his claims save those relating to the December 6, 2013 dispute with

Conklin—and that, accordingly, his allegations should be dismissed.  (*See* Defs.' Mem. 12–16.)

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought

with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement

applies to all personal incidents while in prison, *Porter v. Nussle*, 534 U.S. 516, 532 (2002)

(holding exhaustion is required for "all inmate suits about prison life, whether they involve

general circumstances or particular episodes"); *see also Johnson v. Killian*, 680 F.3d 234, 238

(2d Cir. 2012) (same), and includes actions for monetary damages despite the fact that monetary

damages are not available as an administrative remedy, *Booth v. Churner*, 532 U.S. 731, 741

(2001) (holding exhaustion is required "regardless of the relief offered through administrative

procedures").  Moreover, the PLRA mandates "'proper exhaustion'—that is, 'using all steps that

the agency holds out, and doing so properly,' . . . [which] entails . . . 'completing the administrative review process in accordance with the applicable procedural rules.'" *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006)).

The Second Circuit has made clear that "administrative exhaustion is not a jurisdictional predicate," but rather "failure to exhaust is an affirmative defense." *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (citation omitted). Accordingly, "defendants bear the burden of proof[,] and prisoner plaintiffs need not plead exhaustion with particularity." *McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003); *see also Miller v. Bailey*, No. 05-CV-5493, 2008 WL 1787692, at *3 (E.D.N.Y. Apr. 17, 2008) (explaining that the exhaustion requirement "must be pleaded and proved by a defendant" (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007))). Further, "'[a] court may not dismiss for failure to exhaust administrative remedies unless it determines that such remedies are available.'" *Rossi v. Fischer*, No. 13-CV-3167, 2015 WL 769551, at *4 (S.D.N.Y. Feb. 24, 2015) (quoting *Abney v. McGinnis*, 380 F.3d 663, 668 (2d Cir. 2004)). The Second Circuit has recently made clear that "[w]hether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law," and "defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citation, alteration, and internal quotation marks omitted); *see also Perez v. City of N.Y.*, No. 14-CV-7502, 2015 WL 3652511, at *2 (S.D.N.Y. June 11, 2015) (same).

Finally, the Second Circuit has recognized certain exceptions to the exhaustion requirement that apply when "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense . . . or acted in such a[ ] way as to estop them from

raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). "[T]he resolution of the exhaustion issue does not necessarily fit exactly into any of these three categories, and a particular fact pattern may implicate one or a combination of these factors." *Pagan v. Brown*, No. 08-CV-724, 2009 WL 2581572, at *5 (N.D.N.Y. Aug. 19, 2009) (citing *Giano*, 380 F.3d at 677 n.6). Therefore, a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted only if "nonexhaustion is clear from the face of the complaint, and none of the exceptions outlined by the Second Circuit are germane." *Lovick v. Schriro*, No. 12-CV-7419, 2014 WL 3778184, at *4 (S.D.N.Y. July 25, 2014) (alterations and internal quotation marks omitted); *see also Lee v. O'Harer*, No. 13–CV–1022, 2014 WL 7343997, at *3 (N.D.N.Y. Dec. 23, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents."); *Sloane v. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) ("[B]y characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss." (internal quotation marks omitted)).

Of note, it is not entirely clear that the above-discussed factors—colloquially referred to as the *Hemphill* exceptions—remain good law after the Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 81 (2006). In *Woodford*, the Supreme Court held that the PLRA's exhaustion requirement mandates not merely "exhaustion *simpliciter*" but rather "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules." 548 U.S. at 83, 88, 91. Although Second Circuit has confirmed that *Woodford* may indeed have imperiled

the *Hemphill* exceptions' vitality, it has not yet explicitly decided the question. *See, e.g.*,
*Amador*, 655 F.3d at 102 ("Subsequent decisions have questioned the continued viability of this
framework following the Supreme Court's decision in *Woodford* . . . ."); *Ruggiero*, 467 F.3d at
176 ("We need not determine what effect *Woodford* has on our case law in this area, however,
because [the plaintiff] could not have prevailed even under our pre-*Woodford* case law.");
*Rambert v. Mulkins*, No. 11-CV-7421, 2014 WL 2440747, at *11 (S.D.N.Y. May 30, 2014)
(noting that "the Second Circuit has left unresolved the continuing vitality of the *Hemphill*
exceptions in light of the Supreme Court's ruling in *Woodford v. Ngo*," but concluding that
"*Hemphill* remains good law").

Nevertheless, when nonexhaustion is not clear from the face of the complaint, a
defendant's motion can and should be converted to a motion for summary judgment "limited to
the narrow issue of exhaustion and the relatively straightforward questions about [the] plaintiff's
efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very
limited circumstances, excused." *Stevens v. City of N.Y.*, No. 12-CV-1918, 2012 WL 4948051,
at *3 (S.D.N.Y. Oct. 11, 2012) (quoting *McCoy*, 255 F. Supp. 2d at 251); *see also Rambert*, 2014
WL 2440747, at *6 (same); *Smalls v. Jummonte*, No. 08-CV-4367, 2010 WL 3291587, at *3
(S.D.N.Y. Aug. 13, 2010) (same). When doing so in the context of an action brought by a pro se
prisoner, the potential consequences of a motion for summary judgment as well as the procedural
requirements for responding to one must first be explained, and the Court must also allow
Plaintiff the opportunity to take discovery. *See Hernández v. Coffey*, 582 F.3d 303, 305, 307–08
(2d Cir. 2009) (noting that "[i]n the case of a pro se party . . . , notice is particularly important
because the pro se litigant may be unaware of the consequences of his failure to offer evidence
bearing on triable issues" and that, "[a]ccordingly, pro se parties must have unequivocal notice of

the meaning and consequences of conversion to summary judgment" (alterations, italics, and internal quotation marks omitted)).  As a result, in the PLRA exhaustion context, courts typically have insisted upon limited discovery before converting a motion to dismiss for failure to exhaust administrative remedies as required by the PLRA into a motion for summary judgment.  *See, e.g.*, *Lovick*, 2014 WL 3778184, at *5 (observing that "when converting a Motion to Dismiss into a Motion for Summary Judgment under Fed. R. Civ. P. 12(d), notice to the parties is mandated, particularly when a pro se litigant is involved," and accordingly "permit[ting] the parties to engage in limited discovery confined solely to the issue of administrative exhaustion" (italics omitted)); *Pratt v. City of N.Y.*, 929 F. Supp. 2d 314, 319 (S.D.N.Y. 2013) (noting that the court could convert motion to dismiss into motion for summary judgment on issue of PLRA exhaustion but observing that, if it were to do so, "the parties would be entitled to an opportunity to take discovery and submit additional relevant evidence, and the parties have not yet been allowed such an opportunity"); *Stevens*, 2012 WL 4948051, at *6 (noting that it was appropriate before converting the motion to dismiss into a summary judgment motion to permit discovery limited to the issue of administrative exhaustion).

A number of courts have, however, declined to convert the motion where discovery may reveal whether administrative remedies were available to a plaintiff or other special circumstances would excuse his failure to exhaust.  *See, e.g.*, *McNair v. Rivera*, No. 12-CV-6212, 2013 WL 4779033, at *6 (S.D.N.Y. Sept. 6, 2013) (declining to convert motion because "bifurcating discovery, with additional motion practice, creates the potential for complication and delay," and because "the court [did] not anticipate that full fact discovery [would] be sufficiently laborious . . . to counter [the] plaintiffs' interest in a just disposition of their suits"); *Shapiro v. Cmty. First Servs., Inc.*, No. 11-CV-4061, 2013 WL 1122628, at *6 (E.D.N.Y. Mar.

18, 2013) (declining to convert Rule 12(b)(1) motion to dismiss into motion for summary

judgment because discovery had not yet occurred and because FRCP 12(d) contained no

authority to convert a Rule 12(b)(1) motion into a motion for summary judgment).

     Here, Plaintiff's non-exhaustion is not clear from the face of the Amended Complaint,

and, indeed, Plaintiff argues in his Opposition to Defendants' Motion that his any non-

exhaustion should be excused under one of the *Hemphill* exceptions. (*See* Pl.'s Opp'n 16–17

(section entitled "'Special Circumstances' Justifying Failure To Exhaust").)[15]  Additionally,

although procedurally suspect and less than fully factually dispositive of the question

surrounding whether he, indeed, exhausted, Plaintiff has submitted a document entitled "Pro Se

Plaintiff's Sworn Affidavit in Support of Response To Defendant[]s['] Motion To Dismiss

Amended Complaint Sworn Affidavit of Plaintiff[']s Proof of PLRA Compliance."  (Dkt. No.

31.)  At the risk of inviting further unsolicited and, frankly, unhelpful submissions, the Court

surmises that the fact that Plaintiff has submitted the document—even if not sufficient in its own

right to answer the question of whether exhaustion is clear from the face of the Amended

Complaint—underscores that Plaintiff's Amended Complaint did not mean to intimate that

Plaintiff had failed to exhaust his administrative remedies.

     Therefore, the Court will allow conversion of the instant Motion to one for summary

judgment but will allow for limited discovery on the issue of administrative exhaustion.

"Plaintiff may, for example, respond with evidence of his efforts to exhaust, and/or evidence that

---

[15]  As when non-exhaustion is not clear on the face of a complaint, dismissal is similarly
inappropriate when one of the *Hemphill* exceptions may well be applicable.  *See Lopez v.
Cipolini*, No. 14-CV-2441, 2015 WL 5732076, at *4 (S.D.N.Y. Sept. 30, 2015) ("[A] motion to
dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted only if nonexhaustion
is clear from the face of the complaint, and none of the exceptions outlined by the Second Circuit
are germane." (internal quotation marks omitted)).

(a) administrative remedies were unavailable, (b) he was inhibited from exhausting available remedies by one or more Defendant's actions, or (c) special circumstances exist that justify his failure to comply with the exhaustion requirements." *Smalls*, 2010 WL 3291587, at *3 (citing *Hemphill*, 380 F.3d at 686; *McCoy*, 255 F. Supp. 2d at 251).

### 3. Personal Involvement

Defendants also move to dismiss the Amended Complaint insofar as it seeks relief against Whinnery, Dachisen, Diehl, Hickman, and Susney, and to the extent that it seeks to hold Recktenwald liable for anything beyond her denial of Plaintiff's grievance relating to Conklin's allegedly false incident report. (*See* Defs.' Mem. 17–20.)  The Court agrees.

"A plaintiff bringing a claim under *Bivens* must allege that he has been deprived of a constitutional right by a federal agent acting under color of federal authority." *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006) (citing *Bivens*, 403 U.S. at 389).  "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *see also Thomas*, 470 F.3d at 496 ("Because the doctrine of respondeat superior does not apply in *Bivens* actions, a plaintiff must allege that the individual defendant was personally involved in the constitutional violation." (some italics omitted)); *see also J.S. v. T'Kach*, No. 11-CV-103, 2014 WL 4100589, at *8 (S.D.N.Y. Aug. 20, 2014) (same).

"Before *Iqbal*, the most important case in this Circuit regarding the evidence required to establish the personal involvement of a supervisory official was *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)." *Haynes v. Mattingly*, No. 06-CV-1383, 2014 WL 4792241, at *7 (S.D.N.Y. Sept. 24, 2014), *aff'd*, (2d Cir. Oct. 27, 2015); *see also Correa v. Hastings*, No. 13-CV-5862, 2015 WL 6681186, at *4 (S.D.N.Y. Nov. 2, 2015) (identifying *Colon* as establishing the test for

finding personal involvement in *Bivens* claim where showing of intent is not required).[16]  Under

the framework set forth in that case, courts find personal involvement of a supervisory defendant

where evidence shows:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (italics omitted) (quoting *Colon*,

58 F.3d at 873); *see also Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) (quoting *Colon*,

58 F.3d at 873) (same).  Since then, the Second Circuit has recognized that the "[*Iqbal*]

decision . . . may have heightened the requirements for showing a supervisor's personal

involvement with respect to certain constitutional violations," *Grullon*, 720 F.3d at 139;

however, "[it] has thus far declined to resolve the question."  *Golodner v. City of New London*,

No. 14-CV-173, 2015 WL 1471770, at *7 (D. Conn. Mar. 31, 2015); *see also Fortunato*, 2015

WL 5813376, at *6 (noting that "the continuing validity of the *Colon* factors has been called into

question by the Supreme Court's ruling in *Iqbal*").

---

[16] *Colon* involved a § 1983 claim, not a *Bivens* claim.  *See Colon*, 58 F.3d at 868. Nevertheless, case law both before and after *Iqbal* makes clear that the personal involvement inquiry is the same under both.  *See, e.g.*, *Griffin v. Doe*, 71 F. Supp. 3d 306, 318 (N.D.N.Y. 2014) ("Personal involvement is a prerequisite to the assessment of damages in a [§] 1983 case, and respondeat superior is an inappropriate theory of liability.  The same law is applicable to *Bivens* actions." (citations and italics omitted)); *Alcantara v. City of N.Y.*, 646 F. Supp. 2d 449, 456–57 (S.D.N.Y. 2009) ("Federal courts have typically incorporated § 1983 law into *Bivens* actions.  Both *Bivens* actions and § 1983 suits require personal involvement of the defendants in the alleged constitutional deprivation." (alterations, citations, and internal quotation marks omitted)); *Marsden v. Fed. Bureau of Prisons*, 856 F. Supp. 832, 835 (S.D.N.Y. 1994) ("Under *Bivens*, as under § 1983, a defendant's 'personal involvement' in an alleged deprivation of constitutional rights is a prerequisite to an award of damages.").

a.  Generalized Allegations of Conspiracy

Before delving into Plaintiff's specific allegations against each of these Defendants and whether he sufficiently alleges personal involvement, it bears noting that Plaintiff alleges that "Recktenwald, Whinnery, Dachisen, Susney, Diehl, and Hickman[] rec[ei]ved Plaintiff['s] grievances/complaints about . . . Conklin['s] misconduct and fals[e] fraudulent incident report . . . and conspired to cover it up until Plaintiff served them their copies of his restraining order/motion on Feb. 25.14."  (Pl.'s Opp'n 6 (citing *id.* Ex. O (Letter from Pl. to "Special Investigation Attorney General" (Feb. 24, 2014)), *id.* Ex. P (E.D. Wis. Mot.).)  This broad assertion does not create personal involvement.

To state a legal truism, just because a litigant posits the existence of a conspiracy does not make it plausible.  Indeed, the Supreme Court has made clear, "conclusory . . . allegations" are "disentitle[d] . . . to the presumption of truth."  *Iqbal*, 556 U.S. 681.[17]  Likewise, even under the *Colon* regime, Second Circuit law has long taught that, "merely recit[ing] the legal elements of a successful . . . claim for supervisory liability . . . does not meet the plausibility pleading standard."  *Dotson v. Farrugia*, No. 11-CV-1126, 2012 WL 996997, at *6 (S.D.N.Y. Mar. 26, 2012); *see also Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *Lindsey v. Butler*, 43 F. Supp. 3d 317, 329

---

[17] Although, as acknowledged, courts have questioned the extent of *Iqbal*'s holding on the *Colon* factors, they have done so in the context of considering *Iqbal*'s proscription of respondeat superior liability in § 1983 and *Bivens* suits.  *See, e.g.*, *Reynolds v. Barrett*, 685 F.3d 193, 206 n.14 (2d Cir. 2012) (noting that "*Iqbal* has, of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*" after describing *Iqbal*'s holding as to vicarious liability (citing *Iqbal*, 556 U.S. at 676–77)).  There is no question that *Iqbal*'s other holdings—for instance, that a court need not accept legal conclusions as true when faced with a motion to dismiss, *see Iqbal*, 556 U.S. at 678— applies with no less force in a *Colon* analysis than in any other area of law.

(S.D.N.Y. 2014) ("Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient . . . ." (internal quotation marks omitted)), *reconsideration granted in part on other grounds*, No. 11-CV-9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014), *reconsideration denied*, No. 11-CV-9102, 2015 WL 1501625 (S.D.N.Y. Apr. 1, 2015); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 502 (S.D.N.Y. 2012) ("To the extent [the plaintiff] may argue that [two of the defendants] failed to properly supervise subordinates who were violating her rights, the mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under § 1983." (internal quotation marks omitted)); *Kee v. Hasty*, No. 01-CV-2123, 2004 WL 807071, at *2 (S.D.N.Y. Apr. 14, 2004) (same); *Russo v. Glasser*, 279 F. Supp. 2d 136, 145 (D. Conn. 2003) (determining in *Bivens* action that "[the] [p]laintiff's claims of conspiracy are vague and conclusory, and accordingly are dismissed" (emphasis omitted)).

### b.  Whinnery

With respect to Whinnery, Plaintiff essentially alleges that (1) his BP-8 was submitted to Whinnery, (*see* Am. Compl. ¶ 29; *see also* Pl.'s Opp'n ¶ 2; Pl.'s Opp'n Ex. B (BP-8 Form)), (2) that Whinnery responded to a grievance he brought relating to Conklin's alleged tampering with his mail, (*see* Pl.'s Opp'n ¶ 6; Pl.'s Opp'n Ex. F (Letter from M. Whinnery to Plaintiff (Sept. 30, 2013))), and (3) that "the Supervisory Officials to [sic] actions on Feb. 25, 2014 at or around 9:a.m. or 9:30 a.m., ordered the compound officer to enter into the educational department and called Plaintiff to the front entrance, to[ ]where Plaintiff was escorted to the Lt.'s/Captains' office where Captain Whinnery stated, quote 'this is for my protection.  [W]e want to make sure you[']r[e] not hurt,'" (Pl.'s Opp'n 6–7).

The first of these allegations fails to establish personal involvement because mere receipt of a complaint or grievance from an inmate is insufficient to establish personal involvement, even under the *Colon* regime. *See, e.g.*, *Whitenack v. Armor Med.*, No. 13-CV-2071, 2014 WL 5502300, at *6 (E.D.N.Y. Oct. 30, 2014) ("Since [the] plaintiff has pled no facts, beyond [the sheriff's] presumed receipt of grievances and his position atop the correctional center . . . , [the plaintiff] has failed to plausibly plead [the sheriff's] personal involvement in any infringement of [the plaintiff's] constitutional rights." (alterations and internal quotation marks omitted)); *Rivera v. Bloomberg*, Nos. 11-CV-629, 11-CV-4325, 2012 WL 3655830, at *10 (S.D.N.Y. Aug. 27, 2012) (concluding that the "[p]laintiffs [did] not ple[a]d facts sufficient to demonstrate that [one defendant] was personally involved in the alleged violation of their constitutional rights," despite allegation that the "[p]laintiffs [had] informed [her] of their claims"); *Johnson v. Goord*, No. 01-CV-9587, 2004 WL 2199500, at *7 (S.D.N.Y. Sept. 29, 2004) ("[T]he receipt of letters or grievances or complaints from inmates is insufficient to impute personal involvement."); *Rivera v. Goord*, 119 F. Supp. 2d 327, 344 (S.D.N.Y. 2000) (dismissing complaint against five defendants as to whom the plaintiff failed to allege any facts demonstrating that personal involvement in or knowledge of the alleged constitutional violations, where the plaintiff instead "merely assert[ed] that he wrote to these defendants complaining about the conduct of various [other] [d]efendants and that his complaints were ignored").[18] To be sure, many courts have

---

[18] It merits mentioning that this proposition is not entirely obvious.  In *Grullon*, the Second Circuit considered the district court's dismissal of a pro se inmate's claim against a prison warden for lack of personal involvement.  *See* 720 F.3d at 138–39.  While the case was still at the district court level, the plaintiff submitted a copy of a letter he had allegedly sent to the warden and asked that he "be allowed to amend his complaint" if the court found his allegations against the warden insufficient.  *Id.* at 139–40 (internal quotation marks omitted).  The district court chose to disregard the letter, noting that the plaintiff did not allege that the warden actually received the letter or took any action in response to the letter.  *Id.* at 140.  Reversing, the Second Circuit held that, "[a]t the pleading stage, even if [the plaintiff] had no knowledge or information

declined to dismiss claims pursuant to this principle to situations where the alleged violation is ongoing, such that the defendant's inaction upon receipt of the complaint allowed the violation to persist. *See, e.g.*, *Gantt v. Lape*, No. 10-CV-83, 2011 WL 673783, at *3 (N.D.N.Y. Jan. 18, 2011) ("[T]he second *Colon* category—that a supervisor is personally involved if he or she failed to remedy a violation after learning of it through a report or appeal—applies only to situations where an alleged violation is ongoing, not to situations involving a one-time violation."), *adopted by* 2011 WL 673782 (N.D.N.Y. Feb. 17, 2011); *Zappulla v. Fischer*, No. 11-CV-6733, 2013 WL 1387033, at *9 (S.D.N.Y. Apr. 5, 2013) ("[I]f a plaintiff alleges that a constitutional violation is ongoing, and that a defendant, after being informed of a violation through a report or appeal, failed to remedy the wrong, the plaintiff's claim against that defendant should not [be] dismissed under Rule 12(b)(6)."); *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("[A] supervisor may be liable for her failure to remedy a violation only in those circumstances

---

as to what became of his [l]etter after he sent it," assuming he alleged he sent it to an appropriate address by appropriate means, "he would be entitled to have the court draw the reasonable inference . . . that the [w]arden in fact received the [l]etter, read it, and thereby became aware of the alleged conditions" complained of in that letter. *Id.* at 141. "Several district judges in this Circuit have taken this language to mean that merely writing to a supervisory official who fails to act now suffices to establish personal involvement at the pleading stage." *Ciaprazi v. Fischer*, No. 13-CV-4967, 2015 WL 1315466, at *7 (S.D.N.Y. Feb. 24, 2015), *adopted in part, rejected in part on other grounds*, 2015 WL 1315676 (S.D.N.Y. Mar. 24, 2015) (citing *Jean-Laurent v. Lane*, No. 11-CV-186, 2014 WL 5335981, at *9 (N.D.N.Y. Oct. 20, 2014); *Selah v. Fischer*, No. 09-CV-1363, 2013 WL 5603866, at *3 (N.D.N.Y. Oct. 11, 2013)). Others, however, have stuck by the view that mere receipt of a letter or grievance is not enough. *See, e.g.*, *Huggins v. Schriro*, No. 14-CV-6468, 2015 WL 7345750, at *4 (S.D.N.Y. Nov. 19, 2015); *Ciaprazi*, 2015 WL 1315466, at *7; *Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470, at *16 (S.D.N.Y. Sept. 29, 2014). The better view is that the unique procedural posture of *Grullon*, in which the district court declined to permit a pro se plaintiff to amend his complaint, suggests that traditional concerns of solicitude for pro se plaintiffs and Fed. R. Civ. P. 15's liberal amended policy underlay the Second Circuit's decision, rather than a desire to modify the personal involvement analysis. *See Ciaprazi*, 2015 WL 1315466, at *8 ("In *Grullon*, the court was concerned that the district judge had violated the principle that leave to amend should be granted freely unless any amendment would be futile.").

where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it.").  Thus, the mere receipt of Plaintiff's BP-8 concerning Plaintiff's discrete, non-continuing run-ins with Conklin cannot establish Whinnery's personal involvement for the first allegation.

The second of these allegations fails because it relates to conduct that actually predates the conduct at issue in this case.  (*Compare* Pl.'s Opp'n Ex. F (Letter from M. Whinnery to Plaintiff (Sept. 30, 2013)) *with, e.g.*, Am. Compl. ¶ 1 (indicating that the day upon which Conklin first complained about smelling cigarette smoke was "[o]n or about October into November of 2013").)  While a court "evaluating the legal sufficiency of a pro se plaintiff's claims . . . may rely on the plaintiff's opposition papers," *Vlad-Berindan v. MTA N.Y. City Transit*, No. 14-CV-675, 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014) (italics omitted), a plaintiff may not assert new claims through those opposition papers, *see Weerahandi v. Am. Statistical Ass'n*, No. 14-CV-7688, 2015 WL 5821634, at *8 (S.D.N.Y. Sept. 30, 2015) (noting that the plaintiff raised new claims in his papers opposing the motion to dismiss but "declin[ing] to address them for the purposes of [the] [d]efendant's motion to dismiss" "[b]ecause these claims were not raised in the complaint"); *Bernstein v. City of N.Y.*, 06-CV-895, 2007 WL 1573910, at *10 (S.D.N.Y. May 24, 2007) ("New claims not specifically asserted in the complaint may not be considered by courts when deciding a motion to dismiss." (alterations and internal quotation marks omitted)).  Because Whinnery's handling of a mail dispute several months before the action underlying Plaintiff's *Bivens* claim as described in the Amended Complaint alleges not personal involvement but, at best, a new claim, the Court need not address it.  *See Weerahandi*, 2015 WL 5821634, at *8.

Similar logic also dooms Plaintiff's allegations concerning Whinnery's statement to Plaintiff in the office.  (*See* Pl.'s Opp'n 6–7.)  *See also Weerahandi*, 2015 WL 5821634, at *8 (declining to address new claims in the plaintiff's opposition to the motion to dismiss "[b]ecause these claims were not raised in the complaint").  Even if this statement did not predate the events at issue in this case, it does not fit into any of the existing claims currently included in the Amended Complaint.  Additionally, one struggles to understand what prong of the *Colon* analysis this statement could possibly implicate.  It does not include (1) direct participation in a constitutional violation, (2) a failure to remedy a wrong, (3) creation or perpetuation of a policy or custom under which unconstitutional practices occurred, (4) gross negligence in supervising subordinates, or (5) failure to act upon information.  *See Colon*, 58 F.3d at 873.

Therefore, Plaintiff fails to adequately allege Whinnery's personal involvement in any constitutional fouls allegedly suffered by Plaintiff.

### c.  Diehl

Plaintiff similarly fails to adequately plead Diehl's personal involvement.  As a refresher, Plaintiff alleges that he met with Diehl, who told Plaintiff that he had to wait for the "DHO hearing" before he could file a grievance against Conklin, and Plaintiff said that this was "not [a] DHO matter, but an administrative matte[]r dealing with criminal conduct and acts by a[] United States Government employee in official duties."  (Am. Compl. ¶ 30.)  Plaintiff also alleges that, in early January, 2014, he received a response from Diehl confirming receipt of Plaintiff's BP-8 and telling Plaintiff, among other things, that it was the policy of BOP and the facility "to treat all inmates in a fair and impartial manner," but that "[d]ue to the privacy interest of the staff member which [Plaintiff] name[d]," the findings or result of the review of the matter could not be disclosed to Plaintiff.  (*Id.* ¶ 31; Pl.'s Opp'n Ex. C (Jan. 3, 2014 response); *see also* Pl.'s

Opp'n ¶ 3.)  At best, these assertions can be taken as an allegation that Diehl received Plaintiff's

grievance, which, as stated, is insufficient by itself to establish personal involvement.  *See, e.g.*,

*Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470, at *16 (S.D.N.Y. Sept. 29, 2014),

*appeal dismissed* (Jan. 8, 2015) ("[R]eceipt of letters or grievances is insufficient to impute

personal involvement.  Were it otherwise, virtually every prison inmate who sues for

constitutional torts by prison officials could name the supervisor as a defendant since the plaintiff

must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed

upon by the supervisor." (internal quotation marks omitted)).

### d.  Dachisen

Plaintiff also does not allege enough with respect to Dachisen.  In his submissions,

Plaintiff makes only two allegations that unambiguously refer to Dachisen.[19]  First, Plaintiff

alleges that, "[o]n 1/6/2014, Plaintiff filed his BP-9 administrative remedy to acting Warden, Mr.

Dachisen who intern [sic] once against turned Plaintiff's BP-9 over to SIS, instead of the

administrative rem[e]d[]y co[o]rdinator for the facility."  (Am. Compl. ¶ 33.)  Second, in his

opposition, Plaintiff also states that he "verbally placed [Dachisen] on notice on 12/9/2013 at

main-line of . . . Conklin['s] misconduct and false and fraudulent incident report[] as[ ]well[ ]as

---

[19] That said, Plaintiff also alleges that, "both A.W's . . . [were] made aware of Plaintiff's
living conditions in cell #209 SHU."  (Am. Compl. ¶ 52.)  Plaintiff's reference to the "A.W's"
could be taken to refer to Dachisen, whom he also describes as an "acting Warden."  (*Id.* ¶ 33.)
Of course, an allegation that Dachisen was "made aware" of Plaintiff's living conditions is
strikingly close to the allegation rejected in *Iqbal*.  *See* 556 U.S. at 680–81 (finding
"disentitle[d] . . . to the presumption of truth" by virtue of their "conclusory nature" the
plaintiff's allegations that two senior government officials were "'*knew of*, condoned, and
willfully and maliciously agreed to subject [him]' to *harsh conditions of confinement* 'as a matter
of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate
penological interest'" (last two alterations in original) (emphasis added)).  In any event, because
Plaintiff does not identify Dachisen as one of the "A.W's," the Court will not assume he was
one.  Plaintiff can clarify the allegation in a Second Amended Complaint.

the violations that [were] committed against Plaintiff being sent to the SHU, was in control and

Acting Warden of the FCI [O]tisville Administration before . . . Recktenwald took control."

(Pl.'s Opp'n 2–3.)  As with Diehl, mere allegations that Plaintiff's complaints made their way to

Dachisen are not sufficient.  *See Acevedo*, 2014 WL 5015470, at *16; *see also Barnes v. Prack*,

No. 11-CV-857, 2012 WL 7761905, at *6 (N.D.N.Y. Sept. 7, 2012) (finding that the plaintiff's

allegations that he spoke with a prison superintendent about instances of abuse that the plaintiff

was allegedly experiencing did not establish personal involvement due to lack of facts showing

the superintendent could remedy the problem), *adopted by* 2013 WL 1121353 (N.D.N.Y. Mar.

18, 2013).

### e.  Hickman

Plaintiff likewise fails to satisfactorily allege Hickman's personal involvement.  Plaintiff

alleges that, a few weeks after submitting his BP-9, Hickman called him to the lieutenant's office

to address his BP-9 grievance form against Conklin.  (Am. Compl. ¶ 34; *see also* Pl.'s Opp'n ¶ 4;

Pl.'s Opp'n Ex. D (BP-9 Form and Response).)  Plaintiff allegedly told the "lieutenant" that, if

Conklin were to continue to work in the unit, Plaintiff would wish to proceed and exhaust his

administrative remedy because it was clear to him that "this F.C.I. Otisville administration has

no intentions o[f] ever remed[y]ing this situation of the officer submission of fraudulent and

misleading incident reports."  (Am. Compl. ¶ 34.)[20]  Hickman allegedly then "replied that he

would forward the process, and give his response so Plaintiff can continue exhau[s]ting his BOP

administrative remedy."  (*Id.* ¶ 35.)  Additionally, Plaintiff alleges that Hickman (along with

---

[20] Because Hickman is a lieutenant, (*see* Defs.' Mem. 5 n.4), context suggests he is to
whom Plaintiff refers.

Susney) "waited for Plaintiff to state an affidavit stating the reason why Plaintiff filed his motion" before processing Plaintiff into the SHU.  (*Id.* ¶ 46.)[21]

Here, Plaintiff's allegations are that Hickman helped Plaintiff move his grievance process along and waited for Plaintiff to fill out an affidavit.  As is hopefully clear by now, the first founders because mere receipt of a grievance—if that is even what is alleged here—does not amount to personal involvement.  *See Acevedo*, 2014 WL 5015470, at *16; *Vega v. Artus*, 610 F. Supp. 2d 185, 199 (N.D.N.Y. 2009) (observing that the facility superintendent's act of "referring [the plaintiff's] letters to staff for investigation [was] not sufficient to establish [his] personal involvement").  The second fails because it is not clear how waiting for Plaintiff to fill out an affidavit could amount to personal involvement in depriving him of his constitutional rights. Indeed, if receiving a grievance detailing the facts at issue in this case cannot create personal involvement, simply alleging Hickman's presence while Plaintiff filled out an affidavit falls shorter still.

### f.  Recktenwald

Plaintiff makes a number of allegations about Recktenwald; however, they can be distilled into two categories:  First, Plaintiff alleges that, on February 12, 2014, she "responded to Plaintiff's BP-9 stating that 'On December 10, 2013, the UDC found you committed [Code] 312, [I]nsolence [T]owards a [S]taff Member and sa[n]ctioned, accordingly.  Additionally, you

---

[21] Although not entirely clear, it appears that the motion to which Plaintiff refers is one of his submissions to Judge Griesbach, the Department of Justice, or the BOP.  (*See* Am. Compl. ¶¶ 43–45.)

Additionally, in his Opposition, Plaintiff attached as Exhibit U a February 25, 2014 an "Administrative Detention Order" signed by Hickman.  (*See* Pl.'s Opp'n Ex. U (Administrative Detention Order).)  To the extent that Plaintiff intends to bring a claim against Hickman over his role in a confinement to the SHU, he should clarify his claims in his Second Amended Complaint.

also admitted that you made the statement in reference to the staff member,'" (Am. Compl. ¶ 41; *see also* Pl.'s Opp'n ¶ 5; Pl.'s Opp'n Ex. E.), a statement which Conklin read as giving him "the green light to do as he pleased," (*Id.* ¶ 42).  Second, Plaintiff also alleges that he submitted a number of complaints to Recktenwald, the details of which need not be recited here, or that she was otherwise on notice.  (*See* Am. Compl. ¶¶ 52–54, 57; Pl.'s Opp'n ¶¶ 7, 8, 13; Pl.'s Opp'n 6; Pl.'s Opp'n Ex. G (Letter from Pl. to Warden (Mar. 4, 2014); Pl.'s Opp'n Ex. H (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)); Pl.'s Opp'n Ex. M (Letter from Pl. to Warden (Mar. 5, 2014)).)  Defendants, apparently, do not seek dismissal of Plaintiff's claims against Recktenwald on the basis of personal involvement with respect to the first category.  (*See* Defs.' Mem. 19 ("Only Plaintiff's exhausted allegations regarding Recktenwald's denial of Plaintiff's BP-9 Form could be arguably sufficient to withstand a motion to dismiss, because the allegation that Recktenwald or any other defendant was on notice of Plaintiff's complaints fails to state a claim.").)  With respect to the latter, suffice it to say that "the receipt of letters or grievances or complaints from inmates is insufficient to impute personal involvement," *Johnson*, 2004 WL 2199500, at *7, and generalized allegations of knowledge are too conclusory, *see Iqbal*, 556 U.S. at 680–81.  Therefore, the Court grants the Motion to dismiss Recktenwald with regard to this second category.

### g.  Susney

Finally, Plaintiff's claim also fails with respect to Susney.  Along with Hickman, Susney allegedly "waited for Plaintiff to state an affidavit stating the reason why Plaintiff filed his motion" before he was processed into the SHU.  (Am. Compl. ¶ 46.)  Additionally, Susney "stated to Plaintiff that after he signed the affidavit Plaintiff would receive a[] copy of this document," but failed to subsequently provide one.  (*Id.*; *see also id.* ¶ 53 (indicating that he

wrote to Recktenwald that he signed an affidavit on February 25, 2014 with Susney but had not

received a copy).)  Susney also allegedly "met . . . Plaintiff in R & D" before Plaintiff's transfer

from F.C.I. Otisville and "stated 'because it involves staff, Plaintiff can[]not receive a copy of

his own affidavit.'"  (*Id.* ¶ 46.)  Plaintiff also alleges that, on March 6, 2014 and on March 9,

2014, he requested to speak with Susney, knowing he was on duty at the latter time but that

Susney did not show up to speak with Plaintiff.  (*See* Pl.'s Opp'n ¶ 9–10; Pl.'s Opp'n Ex. I

(Letter from Pl. to SHU lieutenant (Mar. 6, 2014)), Pl.'s Opp'n Ex. J (Letter from Pl. (March 9,

2014)).)  The Court is frankly unsure how Plaintiff's allegations about Susney could be

construed to allege involvement in the purported constitutional infractions at issue in this case.

While it is obligatory to liberally construe Plaintiff's submissions, *see Triestman*, 470 F.3d at

474–75, there exists a line between liberal construction and gratuitous revision.  Because,

ultimately, it is Plaintiff's burden to plead personal involvement, *cf. Ramrattan v. Fischer*, No.

13-CV-6890, 2015 WL 3604242, at *10 (S.D.N.Y. June 9, 2015) ("Plaintiff has not met the

burden of pleading personal involvement for any of the 12 individual [d]efendants."), and

because Plaintiff has not done so, his claim against Susney must also be dismissed.

### 4.  Qualified Immunity

Defendants further argue that "Plaintiff's *Bivens* claims against Whinnery, Dachisen,

Hickman, Susney, Diehl, and Recktenwald fail for the additional reason that these Defendants

are entitled to a qualified immunity from suit on such claims."  (Defs.' Mem. 19.)  Plaintiff's

claims against Whinnery, Dachisen, Hickman, Susney, and Diehl have, however, already been

dismissed for failure to allege personal involvement.  There is thus no need to address the

qualified immunity argument as to those Defendants.  *See Kelsey v. Cty. of Schoharie*, 567 F.3d

54, 62 (2d Cir. 2009) ("When the facts, viewed in light most favorable to the plaintiff, do not

demonstrate that an officer's conduct violated a constitutional right, the court need not further pursue the qualified immunity inquiry."); *see also Dawson v. City of N.Y.*, No. 13-CV-5956, 2014 WL 5020595, at *2 (S.D.N.Y. Oct. 8, 2014) (same); *Cooper v. Marrero*, No. 11-CV-9260, 2013 WL 2529723, at *5 (S.D.N.Y. June 11, 2013) (same).  Because Defendants did not move to dismiss the claim for denying Plaintiff's grievance on appeal asserted against Recktenwald on the grounds of insufficient personal involvement, however, the Court must consider whether it may be dismissed pursuant to the doctrine of qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'"  *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration in original) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)).  Because qualified immunity is "an affirmative defense [that] . . . reflects an immunity from suit rather than a mere defense to liability[,] . . . it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss."  *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013) (italics and internal quotation marks omitted), *aff'd*, 751 F.3d 78 (2d Cir. 2014).

In determining whether a right is clearly established, "th[e] inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."  *Pearson*, 555 U.S. at 244 (internal quotation marks omitted).  "In the

Second Circuit, 'a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004)).

Rectkenwald is entitled to qualified immunity.  As she accurately recounted when denying Plaintiff's BP-9, Plaintiff alleged that "staff made and submitted fraudulent, false[,] and misleading statements personally targeting [Plaintiff]."  (Pl.'s Opp'n Ex. E (BP-9 Response); *see also id.* Ex. D (BP-9 Form and Response).)  Moreover, Recktenwald also noted that "[a] review of the matter" was conducted and concluded that "[Plaintiff] admitted that [he] made the statement [at issue in his disciplinary proceedings] in reference to the staff member."  (Pl.'s Opp'n Ex. E (BP-9 Response).)  Recktenwald additionally informed Plaintiff of his right to appeal her decision to the Regional Director for the Northeast Region of the Federal Bureau of Prisons.  (*Id.*)  This is enough to safely conclude, at the absolute minimum, "a reasonable [warden] would not have understood from the existing law that her conduct was unlawful." *Schubert*, 775 F. Supp. 2d at 702; *see also Green v. Bauvi*, 46 F.3d 189, 195 (2d Cir. 1995) ("[A]dherence to [state] regulations may be pertinent in considering whether a reasonable official would have known his [or her] actions violated the Constitution."); *Selah v. Fischer*, No. 09-CV-1363, 2015 WL 1893340, at *13 (N.D.N.Y. Apr. 15, 2015) (dismissing complaint against correctional facility superintendent on qualified immunity grounds where "he denied plaintiff's appeals in connection with the grievances based on his belief that plaintiff was seeking relief that he was not authorized to provide, and he provided plaintiff with instructions regarding how to seek the relief requested" and followed all relevant New York State Department of Corrections

and Community Supervision policies).[22]  Additionally, given that qualified immunity may shield the prison official who denies an inmate's grievance following an investigation, *see Cancel v. Mazzuca*, 205 F. Supp. 2d 128, 145 (S.D.N.Y. 2002) (finding prison official who denied a grievance on the grounds that he believed a Department of Corrections employee who said the conduct at issue was the result of a "mere misunderstanding" was entitled to qualified immunity), and given that this protection in such cases extends to the official who affirms that denial, *see Cancel v. Mazzuca*, No. 01-CV-3129, 2002 WL 1891395, at *5 (S.D.N.Y. Aug. 15, 2002) (dismissing as futile proposed addition of new defendants who affirmed denial of grievance where the employee who denied the grievance was entitled to qualified immunity, reasoning that the proposed defendants would also be entitled to qualified immunity), it stands to reason that Recktenwald should not be stripped of the same immunity, absent some legally sufficient reason to think her "plainly incompetent or . . . [to have] knowingly violate[d] the law."  *Sheehan*, 135 S. Ct. at 1774 (internal quotation marks omitted).

### 5.  Plaintiff's § 1986 Claim

Defendants also move to dismiss Plaintiff's § 1986 claim for neglect to prevent conspiracy on the grounds that he has not alleged the existence of a conspiracy sufficient under § 1985.  (Defs.' Mem. 21–22.)  Defendants' point is a fair one, and, accordingly, Plaintiff's § 1986 claim is dismissed.

---

[22] Although the "[qualified immunity] inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken," *Pearson*, 555 U.S. at 244, rendering the subjective judgment calls of individuals beside the point, one signpost as to where a reasonable officer's judgment may lie perhaps can be found in the fact that, after receiving Plaintiff's appeal, the acting administrator for national inmate appeals with the BOP both wrote that "[t]he [w]arden at FCI Otisville . . . adequately addressed [Plaintiff's] complaint" and explicitly "concur[red] with the response[] provided."  (Pl.'s Opp'n Ex. A (Office of General Counsel Appeal).)

"[A] § 1986 claim must be predicated upon a valid § 1985 claim."  *Mian v. Donaldson,*

*Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993); *see also Karam v. Cty. of*

*Rensselaer*, No. 13-CV-1018, 2016 WL 51252, at *21 (N.D.N.Y. Jan. 4, 2016) (same); *Poulos v.*

*City of N.Y.*, No. 14-CV-3023, 2015 WL 5707496, at *8 (S.D.N.Y. Sept. 29, 2015) (same);

*Townsend v. New York*, No. 14-CV-6079, 2015 WL 4692604, at *7 (E.D.N.Y. Aug. 6, 2015)

(same).  The Second Circuit has made clear that the four elements of a § 1985(3) claim are:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any
> person or class of persons of equal protection of the laws, or of equal privileges and
> immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby
> a person is either injured in his person or property or deprived of any right of a
> citizen of the United States.

*Mian*, 7 F.3d at 1087 (citing *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 828–

29 (1983)); *see also Townsend*, 2015 WL 4692604, at *7 (same); *Robinson v. Bratton*, No. 14-

CV-2642, 2014 WL 3496460, at *6 (E.D.N.Y. July 8, 2014) (same).[23]  Additionally, "the

conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious

discriminatory animus behind the conspirators' action.'"  *Mian*, 7 F.3d at 1088 (quoting *Scott*,

463 U.S. at 829); *see also Ramirez v. Port Auth.*, No. 15-CV-3225, 2015 WL 9463185, at *7

(S.D.N.Y. Dec. 28, 2015) (same).  While "[§] 1985(3) covers classes beyond race," the term

"class" as used in § 1985(3) "unquestionably connotes something more than a group of

individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors."

---

[23] Even liberally construing Plaintiff's Amended Complaint, § 1985(3) is the only
subsection that could underlie Plaintiff's § 1986 claim; the content of § 1985(1) and (2) is
unambiguously unimplicated by Plaintiff's claims.  *See* 42 U.S.C. § 1985(1), (2); *cf. Dove v.
Fordham Univ.*, 56 F. Supp. 2d 330, 337 n.3 (S.D.N.Y. 1999) ("Although [the plaintiff] does not
specify under which subsection of § 1985 he brings this action, only subsection three is
applicable; § 1985(1) is entitled 'Preventing officer from performing duties,' and § 1985(2) is
entitled 'Obstructing justice; intimidating party, witness, or juror.'"), *aff'd sub nom. Dove v.
O'Hare*, 210 F.3d 354 (2d Cir. 2000).

*Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (internal quotation marks omitted).

Consistent with this logic, the Second Circuit has explicitly rejected the proposition that

"[§] 1985(3) encompasses classes of jailhouse lawyers . . . ."  *Id.*  At best, that is essentially the

argument that Plaintiff makes.  (*See* Am. Compl. ¶¶ 67–71.)  He alleges no action taken against

him as, for instance, a member of a racial, gender, or political subgroup.  *Cf. Dolan*, 794 F.3d at

296 (citing *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1359 (2d Cir. 1989);

*Keating v. Carey*, 706 F.2d 377, 387 (2d Cir. 1983)).  He, therefore, fails to make out a § 1985

claim and, a fortiori, a § 1986 claim.

### 6.  Plaintiff's Access-to-the-Courts Claim

Next, Plaintiff brings a claim under the Fifth and Sixth Amendments for a "violation of

[his right of] access to the court[s]," (Am. Comp. ¶ 83), which Defendants move to dismiss,

(Defs.' Mem. 22–23).[24]

First, Plaintiff cannot make out a Sixth Amendment claim because his Sixth Amendment

rights are not implicated by the facts alleged.  "The Sixth Amendment provides that '[i]n all

criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for

---

[24] Because, in substance, Plaintiff alleges that he was denied a "legal phone call," (Am. Compl. ¶ 83), Plaintiff's invocation of the Sixth Amendment is best construed as an alleged violation of his right to counsel.

To be sure, "the right to counsel and the right of access to the courts are interrelated, since the provision of counsel can be a means of accessing the courts."  *Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001); *see also Johnson v. Fischer*, No. 12-CV-210, 2015 WL 670429, at *22 (N.D.N.Y. Feb. 17, 2015) (same).  However, "the right of access to the courts is grounded not in the Sixth Amendment but in various other constitutional provisions . . . ."  *Bourdon v. Loughren*, 386 F.3d 88, 95 (2d Cir. 2004); *see also Osgood v. Amato*, No. 12-CV-565, 2013 WL 3777189, at *6 (N.D.N.Y. July 17, 2013) ("[A]ccess claims concern the ability of prisoners to attack their sentences, directly or collaterally, and to challenge the conditions of their confinement.  By contrast the Sixth Amendment confers the right of a pretrial detainee, in a case brought against him by the state, to utilize counsel in his defense." (alterations and internal quotation marks omitted)).

his defence.'" *United States v. Mills*, 412 F.3d 325, 328 (2d Cir. 2005) (second alteration in original) (quoting U.S. Const. amend. VI).  However, the words "prosecutions" and "accused" are not mere surplusage, and "the Sixth Amendment only guarantees the right to counsel after formal proceedings have begun against a suspect." *Fountain v. City of White Plains*, No. 13-CV-7016, 2015 WL 5602869, at *6 (S.D.N.Y. Sept. 23, 2015); *see also Mills*, 412 F.3d at 328 ("The Sixth Amendment right to counsel does not attach until a prosecution is commenced . . . ."); *Smart v. City of N.Y.*, No. 08-CV-2203, 2009 WL 862281, at *8 (S.D.N.Y. Apr. 1, 2009) ("[T]he Sixth Amendment right to counsel does not attach until the Government commits itself to prosecution by initiating adversary judicial proceedings." (citing *Moran v. Burbine*, 475 U.S. 412, 431 (1986)); *cf. Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001) (explaining that "[t]he reason pretrial detainees need access to the courts and counsel is not to present claims to the courts, but to defend against the charges brought against them").  However, here, Plaintiff has made no allegations that would suggest his desire to speak with his attorney had anything to do with defending criminal proceedings.  (*See* Am. Comp. ¶ 83.)  To the contrary, Plaintiff alleges that he "rec[ei]ved a correspondent letter from attorney Bonnie M. Mangold regard[ing] *civil action settlement conditions*."  (*Id.* ¶ 65 (emphasis added); *see also id.* ¶ 83 (referring to "attorney Ms. Bonnie Mangold from the law office of Reed[ ]Smith" in a paragraph alleging that "Otisvill[e] staff and administration ignored and refused the request for legal phone call to attorney").)  "[T]he Sixth Amendment does not govern civil cases." *Turner v. Rogers*, 564 U.S. 431, 131 S. Ct. 2507, 2516 (2011).  Consequently, his Sixth Amendment right-to-counsel claim must be dismissed.

Plaintiff's Fifth Amendment right-of-access-to-the-courts claim is also infirm, albeit for different reasons.[25]  To be sure, "[p]risoners have a constitutional right of access to the courts," *Bourdon*, 386 F.3d at 92 (alterations omitted), and courts have construed pro se prisoner's claims related to ability to call their attorney outside the context of criminal proceedings as an access-to-the-courts claim, *see, e.g.*, *Groenow v. Williams*, No. 13-CV-3961, 2014 WL 941276, at *7 (S.D.N.Y. Mar. 11, 2014) (report and recommendation) ("To the extent that [the plaintiff] was communicating with his attorney on monitored lines regarding a matter other than his criminal prosecution or appeal, his claims arise under the right of access to the courts.").  However, an inmate's right to a telephone is not unlimited, and courts routinely consider whether a prison's phone restrictions have wholly closed off his communications with his attorney.  *See, e.g.*, *Huggins v. Schriro*, No. 14-CV-6468, 2015 WL 7345750, at *9 (S.D.N.Y. Nov. 19, 2015) (report and recommendation) ("Because inmates have no right to unlimited telephone calls, a constitutional violation only exists if the inmate was stripped of alternate methods of

---

[25] Although Plaintiff alludes to his Fifth Amendment right of access to the courts, it appears the constitutional source of that right is somewhat broader.  *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002) ("Decisions of this Court have grounded the right of access to courts in the Article IV Privileges and Immunities Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses" (citations omitted)); *Bourdon*, 386 F.3d at 92 ("Prisoners . . . have a constitutional right of access to the courts, as relevant to prisoners, in the constitutional guarantees of equal protection and due process." (citations and internal quotation marks omitted)); *Hamilton v. Fischer*, No. 12-CV-6449, 2015 WL 8207439, at *2 (W.D.N.Y. Dec. 7, 2015) ("The Supreme Court has 'made explicit that the [First Amendment] right to petition extends to all departments of the Government, and that [t]he right of access to the courts is . . . but one aspect of the right of petition.'" (second and third alterations in original) (some internal quotation marks omitted) (quoting *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 525 (2002))); *Groenow v. Williams*, No. 13-CV-3961, 2014 WL 941276, at *7 (S.D.N.Y. Mar. 11, 2014) (report and recommendation) ("The Supreme Court has 'grounded' this right [of access to the courts] in a number of constitutional provisions, including the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses.")

communication." (citation and internal quotation marks omitted)); *Martinez v. Healey*, No. 14-CV-302, 2014 WL 5090056, at *3 (S.D.N.Y. Oct. 10, 2014) (noting that "inmates have no right to unlimited telephone calls" and that "phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world, and particularly with counsel" (alteration and internal quotation marks omitted)); *Edwards v. Horn*, No. 10-CV-6194, 2012 WL 760172, at *5 (S.D.N.Y. Mar. 8, 2012) ("Because inmates have no right to unlimited telephone calls, [the plaintiff] must, but fails to, allege that he was stripped of alternate methods of communication to state a violation of his constitutional rights" (alterations, citation, and internal quotation marks omitted)); *Henry v. Davis*, No. 10-CV-7575, 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) ("Phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world, and particularly with counsel."), *adopted by* 2011 WL 5006831 (S.D.N.Y. Oct. 20, 2011); *Paulino v. Menifee*, No. 00-CV-5719, 2001 WL 243207, at *2 (S.D.N.Y. Mar. 9, 2001) (denying injunction to restore phone privileges where inmate did not allege that alternate means of communication were inadequate); *Bellamy v. McMickens*, 692 F. Supp. 205, 214 (S.D.N.Y. 1988) ("[R]estrictions on inmates' access to counsel via the telephone may be permitted as long as prisoners have some manner of access to counsel."); *Pino v. Dalsheim*, 558 F. Supp. 673, 674–75 (S.D.N.Y. 1983) (permitting restrictions on telephone use in light of the inmate's unlimited opportunities to communicate with his attorney by, among other options, written correspondence).  Here, Plaintiff has not alleged that he had no other method of accessing counsel; in fact, if anything, Plaintiff's allegations suggest that he was able to correspond with her by letter.  (*See* Am. Compl. ¶ 65.)

Plaintiff's claim relating to his access to the courts suffers from a second deficiency, however, which is that he alleges no injury from it.  When asserting a claim for deprivation of the right to access the courts, a plaintiff must allege facts sufficient to show that he suffered an actual injury.  *See Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Groenow*, 2014 WL 941276, at *7 ("[A] plaintiff must show that deprivation of his right to access the courts unfairly prejudiced his case."  (citing *Lewis*, 518 U.S. at 353)); *Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5970355, at *12 (S.D.N.Y. Oct. 13, 2015) ("In order to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in an actual injury to the plaintiff." (internal quotation marks omitted)).  To do so, a plaintiff must "demonstrate that the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim."  *Quezada*, 2015 WL 5970355, at *12 (internal quotation marks omitted); *see also Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997) ("In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, i.e., took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." (alterations and internal quotation marks omitted)); *Williams v. Superintendent of Brooklyn Det. Ctr.*, No. 15-CV-6085, 2015 WL 7281646, at *2 (E.D.N.Y. Nov. 17, 2015) ("[T]he plaintiff must show that a nonfrivolous legal claim had been frustrated or was being impeded due to the actions of prison officials." (alterations and internal quotation marks omitted)).  "Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation."  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted); *see also Smith v. City of N.Y.*, No. 14-CV-443, 2015 WL 1433321, at *3 (S.D.N.Y. Mar. 30, 2015) (same).

Although it is not entirely clear, Plaintiff seems to argue that he suffered prejudice in that the "attorney contact stated that if there was any questions in the proceedings, Plaintiff was to contact them."  (Am. Compl. ¶ 83.)  Because forcing Plaintiff to correspond with attorneys by means other than a phone call seems to eke out, at best, a claim for "mere delay," *Davis*, 320 F.3d at 352, Plaintiff's allegations do not state a constitutional injury.  Indeed, nothing else in his submissions indicates that that Plaintiff has suffered the type of injury needed to state an access-to-courts claim.  *See Lewis*, 518 U.S. at 349, 353.  Therefore, Plaintiff's access-to-the-courts claim is dismissed.

### 7.  Plaintiff's Retaliation Claims

Next, Defendants move to dismiss Plaintiff's claims for retaliation, arguing that some of his retaliation claims are unexhausted and the others relating to Conklin—contained in ¶¶ 5–6, 10–14, and 24–26—fail to state a claim.  (Defs.' Mem. 23–25.)  Because the Court cannot reach the former question until after the Parties have had the chance to engage in limited discovery concerning the exhaustion issue for the reasons discussed earlier, the Court takes up the question of whether Plaintiff has stated a claim for the false incident report grievance.

"To state a First Amendment retaliation claim . . . , a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'"  *Dolan*, 794 F.3d at 294 (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Quezada*, 2015 WL 5970355, at *19 (same); *Ramrattan*, 2015 WL 3604242, at *12 (same).[26]  The Second Circuit has made clear that courts are to "approach prisoner retaliation

---

[26] Because Plaintiff argues that Conklin retaliated against Plaintiff on the basis of his statements, Plaintiff's retaliation claim—to the extent that he states one—is appropriately

claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Davis*, 320 F.3d at 352; *see also Dolan*, 794 F.3d at 295 (same); *Corley v. City of N.Y.*, No. 14-CV-3202, 2015 WL 5729985, at *8 (S.D.N.Y. Sept. 30, 2015) (same). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Davis,* 320 F.3d at 353 (internal quotation marks omitted). A corollary of that proposition, however, is that the "ordinary firmness" inquiry is not subjective, and a prisoner may still suffer adverse action even where undeterred. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[T]he fact that a particular plaintiff . . . responded to retaliation with greater than 'ordinary firmness' does not deprive him of a cause of action."); *see also Nelson v. McGrain*, No. 12-CV-6292, 2015 WL 7571911, at *1 (W.D.N.Y. Nov. 24, 2015) ("[A] prisoner can state a retaliation claim in the absence of actual deterrence." (quoting *Nelson v. McGrain*, 596 F. App'x 37, 38 (2d Cir. 2015))).

Regardless of whether Plaintiff has suffered an adverse action, his claim fails because he has not pled that he engaged in protected activity causally connected to at least potentially adverse action. By the Court's liberal reading, Plaintiff has alleged several actions that arguably could count as protected activity:

- First, Plaintiff alleges that, sometime in approximately October or November 2013, he "addressed th[e] issue" of Conklin's authority to restrict television use at 10 pm if Conklin continued to smell cigarette smoke. (*See* Am. Compl. ¶¶ 1–4.)

- Next, Plaintiff alleges that, on December 6, 2013, he demanded to know why Conklin wanted his ID and told him that he was "not [Plaintiff's] unit officer and [that] [Plaintiff] should know why [his] ID [was] being requested." (*See id.* ¶¶ 8, 12, 24–26.)

_____

considered a claim for First Amendment retaliation. (*See, e.g.*, Am. Compl. ¶¶ 3, 6, 12, 24–26 (describing Plaintiff's various statements to Conklin leading up to his placement in the SHU).)

- Plaintiff alleges that, on December 6, 2013, he told the inmates in reference to Conklin's request for IDs, "that he has me fucked up because I don['']t associate with anyone in D-A like that."  (*Id.* ¶ 14.)

- Fourth, on December 6, 2013, Plaintiff spoke to an officer and Ferdula about his interchange with Conklin, and then described the situation when asked to Heli.  (*Id.* ¶¶ 16–17, 19.)

Similarly, Plaintiff alleges the following potentially adverse actions:

- Since the date in October or November 2013 when Plaintiff made his initial comments to Conklin, "Conklin's attitude changed towards . . . Plaintiff, [in that] every time . . . Conklin s[aw] Plaintiff, he verbally and ph[ys]ically har[]assed . . . Plaintiff," and further made "[s]arcastic comment[]s . . . to . . . Plaintiff," "pat-s[]earch[ed] Plaintiff down and check[ed] Plaintiff's carrying bag," "search[ed] Plaintiff[,] and stat[ed] that there will be a[ ]lot of changes when [he] start[s] to work back in [another unit] next quarter."  (*Id.* ¶ 6.) [27]

- On December 6, 2013, Conklin "walked past everyone else [in the unit] [and] . . . walked directly to Plaintiff and asked Plaintiff for his ID," telling Plaintiff when he asked why his ID was being requested that he would "find out soon," and then asking other inmates for their ID to "make it look that [Conklin] was not singling Plaintiff out, or personally attacking [him]."  (*See id.* ¶¶ 8, 12–13.)

- Sometime on December 6, 2013, Conklin prepared a "false and fraudulent incident report."  (*See id.* ¶¶ 17–19, 24–26.) [28]

---

[27] In considering some of these alleged possible adverse actions, the Court notes that, despite arguing that "Plaintiff failed to exhaust his administrative remedies with respect to any allegations of retaliation outside of the alleged false incident report grievance," (Defs.' Mem. 23–24), Defendants also indicate that "the only relevant allegations regarding Plaintiff's retaliation claim that are properly before this Court allege Conklin's singling Plaintiff out, making sarcastic comments toward and pat searching Plaintiff, and then filing an allegedly false incident report against Plaintiff," (*id.* at 24 (citing Am. Compl. ¶¶ 5–6, 10–14, 24–26)). Therefore, although it is not obvious to the Court that Plaintiff's allegations concerning Conklin's alleged sarcastic comments, for instance, would fall within the ambit of his concededly exhausted claim concerning the false incident report grievance, the Court treats them as potential instances of adverse action all the same.  *See Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 445 (2d Cir. 2006) ("[A] litigant's failure to exhaust in the PLRA context is an affirmative defense that can be waived . . . .").

[28] Plaintiff's allegations make clear that the incident report was prepared sometime before Plaintiff met with Ferdula and the other officer on December 6, 2013.  (*See* Am. Compl. ¶¶ 17–19 (noting that Plaintiff was called from Ferdula's office into the "Lt.'s office," where he was read the contents of Conklin's incident report).)

- On December 6, 2013, Plaintiff was placed in the SHU, where he received a copy of Conklin's false incident report.  (*See id.* ¶¶ 24–26.)

At the outset, it merits clarifying that not every statement an inmate makes in prison is afforded First Amendment protection.  Indeed, "[t]he Supreme Court has held that '[i]n a prison context, an inmate does not retain those First Amendment rights that are inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009) (second alteration in original) (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977)); *see also Williams v. Walter Ford*, No. 14-CV-1181, 2015 WL 8490910, at *5 (D. Conn. Dec. 10, 2015) (same).

Nevertheless, there is authority in the Second Circuit for the proposition that verbal complaints can be protected action for purposes of a First Amendment retaliation claim.  *See, e.g.*, *Tirado v. Shutt*, No. 13-CV-2848, 2015 WL 774982, at *9 (S.D.N.Y. Feb. 23, 2015) ("[C]ase law in this Circuit indicates that a prisoner's oral complaints to a correction officer may serve as the basis for a First Amendment retaliation claim."), *adopted in part by* 2015 WL 4476027 (S.D.N.Y. July 22, 2015); *Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *24 n.10 (S.D.N.Y. May 29, 2007) ("The [c]ourt notes that some case law indicates that a prisoner's oral complaints to prison guards may provide the basis for a retaliation claim under § 1983."); *Smith v. Woods*, No. 03-CV-480, 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006) ("I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers."), *aff'd*, 219 F. App'x 110 (2d Cir. 2007); *Gill v. Riddick*, No. 03-CV-1456, 2005 WL 755745, at *10 (N.D.N.Y. Mar. 31, 2005) (finding the "filing of the grievance agenda and making oral complaints" to be "clearly protected").  *But see Allah-Kasiem v. Sidorowicz*, No. 09-

CV-9665, 2012 WL 2912930, at *1, *8–9 (S.D.N.Y. July 17, 2012) (rejecting plaintiff's argument that he filed an "'oral sexual harassment complaint' or grievance" when he made an "extremely graphic" comment to a prison guard, reasoning that, "[h]aving chosen not to use the grievance process . . . , [the plaintiff] [could not] claim that his comments to [the guard] [were] entitled to the same protection that adheres to properly filed grievances").

However, courts in the Second Circuit and others have distinguished between unambiguously protected activity and situations where an inmate verbally confronts a prison official. *See, e.g.*, *Rodriguez v. Phillips*, 66 F.3d 470, 478 (2d Cir. 1995) (finding in the qualified immunity context "no clearly established First Amendment right to approach and speak to" an officer who allegedly retaliated against the plaintiff inmate where the plaintiff "'approached [the officer] and . . . told [him] that according to institutional policy that was wrong what he was doing'" after seeing that the officer "'was trying to implement something on another inmate'" who "'couldn't defend himself'"); *Young v. Ice*, No. 14-CV-1475, 2015 WL 471675, at *3 (N.D. Ohio Feb. 4, 2015) ("While prisoners have a clear right protected by the First Amendment to file formal grievances against prison officials, arguing with corrections officers, or being insolent or disrespectful toward corrections officers is not conduct protected by the First Amendment." (citation omitted)); *Martin v. Hurley*, No. 14-CV-66, 2014 WL 7157336, at *2 (E.D. Mo. Dec. 15, 2014) ("Prisoners have no constitutionally protected right to confront staff and discuss issues with them, particularly when ordered not to do so."); *Riddick v. Arnone*, No. 11-CV-631, 2012 WL 2716355, at *7 (D. Conn. July 9, 2012) (finding the inmate plaintiff's statement that a correctional facility employee could not issue a disciplinary report "more like a schoolyard taunt than an attempt to petition the government for redress of grievances," and, therefore, unprotected); *Rossi v. Goord*, No. 00-CV-1521, 2006 WL 2811505, at *10 n.16 (N.D.N.Y. Sept.

28, 2006) ("The questioning by an inmate of a lawful order given by a corrections officer,
however, does not constitute protected speech deserving of First Amendment protection." (citing
*Rodriguez,* 66 F.3d at 478–79), *reconsideration granted in part on other grounds*, 2007 WL
952051 (N.D.N.Y. Mar. 29, 2007); *Garrido v. Coughlin*, 716 F. Supp. 98, 101 (S.D.N.Y. 1989)
("While there is a claim of retaliation here . . . , it was not for exercise of [the plaintiff's] First
Amendment rights; rather, the alleged retaliation arose out of a verbal confrontation."). *But cf.
Lugo v. Van Orden*, No. 07-CV-879, 2008 WL 2884925, at *3 n.4 (N.D.N.Y. July 23, 2008) ("A
simple discussion with a corrections officer would not be protected speech unless that discussion
was in the form of a complaint or concern about the officer or some policy involved.").

　　　　The Court does not underestimate the importance—both as a practical and a
constitutional matter—of preserving inmates' ability to bring grievances. *See, e.g.*, *Davis*, 320
F.3d at 352–53 ("[T]he filing of prison grievances is a constitutionally protected activity . . . .").
Nevertheless, there is a distinction to be made between the inmate who stridently challenges a
prison official's authority in the moment and his peer who instead brings his complaints through
the designated channels, such as the prison's grievance procedure, where feasible. *Cf.
Rodriguez*, 66 F.3d at 478.  For that reason, Plaintiff's comments fall on the wrong side of the
line.  Indeed, Plaintiff's fall 2013 attempt to "address[] th[e] issue" of Conklin's authority to
restrict television use at 10 pm should the smell of cigarette smoke continue unabated, (*see* Am.
Compl. ¶¶ 1–4), amounted to little if anything more than an effort to "confront [a member of]
staff and discuss [an] issue[] with him," *Martin*, 2014 WL 7157336, at *2, which, in prison,
simply does not enjoy First Amendment protection, *see Garrido*, 716 F. Supp. at 101
(distinguishing between "[an] exercise of [the plaintiff's] First Amendment rights" and "a verbal
confrontation").  Likewise, no greater protection is afforded to Plaintiff's December 6, 2013

demand to know why Conklin wanted his ID coupled with the comment that Conklin was "not [Plaintiff's] unit officer and [that] [Plaintiff] should know why [his] ID [was] being requested," (*see* Am. Compl. ¶¶ 8, 12), or Plaintiff's  remark "that [Conklin] has [Plaintiff] fucked up because [Plaintiff] do[es]n[']t associate with anyone in D-A like that," (*id.* ¶ 14), as each plainly falls somewhere on the spectrum between "schoolyard taunt," *Riddick*, 2012 WL 2716355, at *7, and "[t]he questioning by an inmate of a lawful order given by a corrections officer," *Rossi*, 2006 WL 2811505, at *10 n.16.  Accordingly, Plaintiff's complaints to Conklin or about him to the other inmates were not protected activity, and his retaliation claim with respect to those incidents collapses as a consequence.  (*See* Am. Compl. ¶¶ 1–4, 12, 14, 24–26.)

Plaintiff's decision to speak with another officer and Ferdula about his run-ins with Conklin, (*id.* ¶¶ 16–17), and his subsequent conversation with Heli, (*id.* ¶ 19), may, conceptually, be another matter; however, they also fail.  As noted, a retaliation claim requires a "causal connection" between the protected action and the adverse action.  *Dolan*, 794 F.3d at 294.  It is true that "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."  *Espinal*, 558 F.3d at 129; *see also Colon*, 58 F.3d at 872 ("Temporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation."); *Quezada*, 2015 WL 5970355, at *20 (same).  However, it is also true that, where the allegedly adverse action occurs *before* the allegedly protected activity, a court may appropriately decline to find a causal connection.  *See Winfield v. Bishop*, No. 09-CV-1055, 2012 WL 1657190, at *4 (N.D.N.Y. May 10, 2012) ("[T]he [a]mended [c]omplaint states that other adverse action preceded the protected conduct . . . .  Given these facts and the particular care with which courts must scrutinize retaliation claims, the [c]ourt finds that [the] [p]laintiff has failed to state a retaliation claim

against [one of the] [d]efendant[s].”); *Rose v. Goldman*, No. 02-CV-5370, 2009 WL 4891810, at

*14 (E.D.N.Y. Dec. 9, 2009) (rejecting the plaintiff’s assertions of causal connection upon

motion for summary judgment, and noting that the defendant took the allegedly adverse action

before the plaintiff engaged in any alleged protected activity), *adopted by* 2011 WL 1130214

(E.D.N.Y. Mar. 24, 2011); *cf. Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir.

2001) (noting in employment context that, “[w]here timing is the only basis for a claim of

retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in

any protected activity, an inference of retaliation does not arise”).  Here, Plaintiff alleges that

Conklin’s report—that is, the adverse action for his retaliation claim—*preceded* those

conversations.  (*See id.* ¶¶ 16–21 (describing, inter alia, how, Plaintiff spoke with another officer

about Conklin, and “then” Ferdula called Plaintiff to her office where they had a conversation,

after which “Ferdula . . . stated to Plaintiff that he was being called to the Lt. office,” where he

“listened to the Lt. Heli state what . . . Conklin wrote and filed in his incident report”).)  Even if

Plaintiff’s complaints to this officer and Ferdula were protected activities—which the Court does

not hold at this time—there is simply no causal connection between it and the allegedly adverse

activities.

  C.  Plaintiff’s August 4, 2015 Motion

   Since submission of Defendants’ Motion to Dismiss, Plaintiff also submitted an August

4, 2015 “Complaint Supplemental ‘[E]mergency Ex Parte’ Motion To Preserve Evidence.”  In

that Motion, Plaintiff requests certain video footage and sign-in logs.  (*See* Compl. Suppl.

‘[E]mergency Ex Parte’ Mot. To Preserve Evidence (“Pl.’s Evid. Mot.”) 2–3 (Dkt. No. 32).)[29]

---

[29]  The video footage he requests is:
- SHU upstairs range surveillance video from 7:00 pm on December 16, 2013, (Pl.’s Evid. Mot. at 2);

Plaintiff says that, based upon his "experience[,] personal knowledge, and belief," BOP staff will, among other similar acts, "intentionally suppress" the evidence Plaintiff seeks, and therefore asks the Court for a "preliminary injunction directing [Recktenwald], and tho[]se under her immed[i]ate control, to preserve all foregoing referenced evidence and further, [to] take no action whatsoever that might tend to prejudice or compromise Plaintiff's case and/or preemptively 'moot' it." (*Id.* at 4–5.) Plaintiff explains that "[b]arring judicial order, all surv[e]illance videos are routinely recorded over after a 12 month holding period which is set to expire in this particular instance." (*Id.*)[30]

- SHU control surveillance videos for cell #209 (1) from 5:30 am through 7:00 am on March 6, 2014, and (2) from 6:00 am through 9:00 am on March 11, 2014, (*id.*);
- SHU control surveillance videos "for the hour of 12[ ][noon] through 2:30 pm on March 5 and 12, 2014," (*id.*);
- All D-A Unit internal and external (unit tiers and walkways) surveillance videos "that tend[] to show staff and inmate movement to and from D-A unit" between 4:30 pm and 6:00 pm on December 6, 2013, (*id.* at 3);
- "All D-B United [sic] internal and external (Unit tiers and walkw[]ays) surv[e]illance videos (including video from D-A Unit camera(s) that tend[] to show staff and inmate movement to and from D-B Unit)," (*id.*);
- "All D-B Unit hallway internal and external (Unit walkways) surv[e]illance video (including video from D-A Unit cameras/tiers and walkways that tends to show staff and inmate movement to D-B from D-A Unit) between the hours of 4:30p.m. through[] to 7:30p.m. on 12/6/2013," (*id.*); and
- "All D-B Unit internal and external (Unit Dorm) surv[e]illance videos that tend[] to show staff and inmate movement from D-B Unit Dorm to hallway walkway between the hours of 2:30p.m. through to 10: Oclock [sic] on or about 12/16/2013 [sic], 12/7/2013 [sic] . . . . ," (*id.*).

The sign-in logs Plaintiff requests are:

- SHU upstairs range sign-in log from 7:00 pm on December 16, 2013, (*id.* at 2);
- Unit D-A log entries for December 6, 2013, (*id.* at 3); and
- Unit D-B log entries for "on or about" December 16, 2013 or December 7, 2013, (*id.*).

[30] The footage Plaintiff seeks principally dates back to December 2013, although some of his requests extend to March 2014. (*See* Pl.'s Evid. Mot. 2–3.) He offers no explanation as to the logic by which he concludes that such footage, if subject to a "12 month holding period,"

In response to Plaintiff's Motion, Defendants submitted a declaration from Wayne D. McBride ("McBride"), a technician in the Special Investigative Service Department at Otisville. (*See* Decl. of Wayne D. McBride ("McBride Decl.") ¶ 1 (Dkt. No. 35).)  According to McBride, Otisville has 208 security cameras running nonstop, which capture video but not audio, and footage from which is stored for a maximum of 21 days, unless staff overrides that automatic purge in order to preserve specific recordings.  (*Id.* ¶¶ 3–5.)  McBride indicated that the requested video footage had already been deleted by the date of Plaintiff's Motion.  (*See id.* ¶ 8.) Additionally, McBride states that Plaintiff had previously requested some of the same video footage in connection with his January 7, 2014 BP-9 but that it had already been deleted by that time.  (*Id.*)[31]  Moreover, judging by McBride's declaration, he searched for all of the video footage that Plaintiff requested and for which he provided a date, only to find that the footage had been deleted.  (*Compare id.* ¶ 6, *with* Pl.'s Evid. Mot. 2–3.)  McBride indicated that he had copies of the log books for the SHU for December 6 and 16, Housing Unit D-A for December 6, and Housing Unit D-B for December 6 and 7.  (*See* McBride Decl. ¶ 9.)  McBride also indicated that he had a copy of the SHU sign-in log for December 16, 2013 but noted that Plaintiff was in general population that day.  (*Id.* ¶ 10.)  Nevertheless, he said that he would preserve a copy a result of Plaintiff's Motion.  (*See id.*)

---

would be "set to expire" after the submission of his July 2015 motion, as opposed to in December 2014 or March 2015.  (*See id.* at 5.)

[31] Plaintiff appears skeptical that Defendants actually destroyed the videotape, arguing in his Reply submission that they must have seen it to have affirmed the denials of his grievance. (*See* Pro Se Pl.'s Response and Sanction for Spoliation of Evid. Mot. to the Def.'s Mem. of Law in Response to Pl.'s Mot. To. Preserve Evid. ("Pl.'s Evid. Reply"), at unnumbered 15–16 (Dkt. No. 48).)  Plaintiff's conjecture, however, is insufficient to override the contents of the McBride Declaration.

In his Motion, Plaintiff did not appear to request any sanctions; however, anticipating that

he might, Defendants argued in their Memorandum of Law that, should he do so, sanctions

would be inappropriate and that Defendants had not spoliated evidence.  (*See, e.g.*, Defs.' Mem.

of Law in Response to Pl.'s Mot. To Preserve Evid. ("Defs.' Evid. Opp'n.") 7 (Dkt. No. 34).)

Moreover, Defendants argue that Plaintiff incorrectly seeks injunctive relief when he should seek

discovery and that his request is, in any event, mooted as the relevant logs were being produced

in response to the Motion.  (*Id.* at 3–5.)

### 1.  Request for Injunction

Plaintiff's request for an injunction is meritless.  In order to obtain a preliminary

injunction, a movant must ordinarily show:  "(1) a likelihood of irreparable harm in the absence

of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious

questions going to the merits to make them a fair ground for litigation, with a balance of

hardships tipping decidedly in the movant's favor."  *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d

Cir. 2008); *see also VIDIVIXI, LLC v. Grattan*, No. 15-CV-7364, 2016 WL 106241, at *3

(S.D.N.Y. Jan. 11, 2016) (same); *Ins. Co. of the State of Pa. v. Lakeshore Toltest JV, LLC*, No.

15-CV-1436, 2015 WL 8488579, at *1 (S.D.N.Y. Nov. 30, 2015) (same).  While a district court

has wide discretion in determining whether to grant a preliminary injunction, *see Moore v.

Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005); *NM v. Hebrew Acad. Long Beach*, No.

15-CV-7004, 2016 WL 105950, at *9 (E.D.N.Y. Jan. 9, 2016), it is nevertheless an "an

extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear

showing, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997);

*see also Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986) ("[P]reliminary injunctive relief is an

extraordinary remedy and should not be routinely granted."); *Safe Step Walk-In Tub Co. v. CKH*

*Indus., Inc.*, No. 05-CV-7543, 2015 WL 6504284, at *1 (S.D.N.Y. Oct. 26, 2015) (same).  "The

purpose of a preliminary injunction is to preserve the status quo between the parties pending a

final determination of the merits."  *SymQuest Grp., Inc. v. Canon U.S.A., Inc.*, No. 15-CV-4200,

2015 WL 6813599, at *4 (E.D.N.Y. Aug. 7, 2015), *adopted by* 2015 WL 6813494 (E.D.N.Y.

Aug. 28, 2015); *see also In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins.

Litig.)*, 770 F.2d 328, 338 (2d Cir. 1985) ("Preliminary injunctions under Rule 65 are designed to

preserve the status quo between the parties before the court pending a decision on the merits of

the case at hand."); *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 99 F. Supp.

3d 288, 301 (E.D.N.Y. 2015) (same).

Plaintiff has not carried his burden of persuasion.  Most obviously, his preliminary

injunction does not seek to preserve the status quo because essentially all of the material that he

seeks (a) was destroyed long before his motion, (b) has been turned over to him, or (c) will be

preserved.  (*See* McBride Decl. ¶¶ 6–10.)[32]  Likewise, he has failed to carry his burden of

establishing a likelihood of irreparable harm.  It may well be that the "intentional[]

sup[p]ress[ion] [of] evidence," (*see* Pl.'s Evid. Mot. at 4), as an abstract matter, would constitute

---

[32] Technically, Plaintiff also requested the D-B Unit logbook for December 16, 2013, (*see*
Pl.'s Evid. Mot. 3), although it was not mentioned as something that Defendants would produce
or retain in the McBride Declaration, (*see* McBride Decl. ¶¶ 9–10).  The Court thinks—as, it
suspects, Defendants do too—that Plaintiff's allusions to December 16 was a typo, since he
requests the logbook for "12/16/2013 [and] 12/7/2013," (*see* Pl.'s Evid. Mot. 3.), and because his
allegations about events that occurred in the D-B unit seem to have occurred on December 6,
(*see* Am. Compl. ¶¶ 7–12).  Consistent with that intuition, the McBride Declaration indicates that
Defendants conducted searches for evidence from December 6 in addition to requests for
evidence from December 16.  (*Compare, e.g.*, Pl.'s Evid. Mot. 2 (requesting SHU footage and
the SHU sign-in book from December 16, 2013), *with* McBride Decl. ¶¶ 6, 9–10 (indicating that
he searched for footage from the SHU on December 6 and December 16 and that he was
producing the December 6 SHU logbook and would retain the December 16 SHU logbook).)
Therefore, while it would not *technically* be correct to say that everything Plaintiff requests was
either destroyed before his Motion, produced, or retained, that is essentially true.

irreparable harm.  However, the test is not whether a plaintiff can speculate as to an irreparable

harm that may befall him, but rather if he can "*show* irreparable harm absent injunctive relief."

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 33

(2d Cir. 2010) (emphasis added).[33]  Here, even assuming the irreparably harmful character of the

alleged future conduct that Plaintiff imputes to Defendants, he has not shown that he would

suffer that harm absent injunctive relief.  *Cf. Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d

904, 907 (2d Cir. 1990) ("Irreparable harm must be shown by the moving party to be imminent,

not remote or speculative . . . .").  Indeed, his submission belies any such argument by positing

that "surv[e]illance videos are routinely recorded over after a 12 month holding period" and yet

seeking relief after that 12-month period expired.  (*See* Pl.'s Evid. Mot. 5.)  To upset the status

quo based on a plaintiff's self-contradictory speculations would contravene many of the

principles guiding the Court's discretion when assessing the merits of a proposed preliminary

injunction.

---

[33] In his reply, Plaintiff presents additional arguments that arguably touch on the
irreparable harm inquiry; however, they do not affect the outcome here.  More specifically,
Plaintiff argues that his "'Personal Experi[e]nce with BOP Staff' . . . sufficiently demonstrates
the BOP policy, practice and custom to create an irreparable harm" and that he "personally
handed to Lt. Susney, on Dec. 9, 2013[,] the Monday Plaintiff was release[d] from SHU" his
"cop-out-complaint," apparently in an attempt to suggest that Defendants should have preserved
the evidence while it still existed.  (Pl.'s Evid. Reply, at unnumbered 1.)  The first argument fails
because Plaintiff's suspicions of BOP staff do not amount to a likelihood of irreparable harm.
*Cf. True the Vote, Inc. v. Internal Revenue Serv.*, No. 13-CV-734, 2014 WL 4347197, at *3
(D.D.C. Aug. 7, 2014) (noting in irreparable harm component of preliminary injunction
proceedings in which the plaintiff alleged spoliation of emails that "despite the general distrust of
the defendants expressed by the plaintiff, the [c]ourt has no factual basis to concur with that
distrust").  Plaintiff's assertion that he complained to Susney on December 9 is not enough
because it is not at all clear that one complaint to one prison official almost three weeks before
Plaintiff even filed his BP-8, (*see* Pl.'s Opp'n Ex. B. (BP-8 Form, dated Dec. 28, 2013)), entitles
him to an injunction forbidding the Defendants from destroying that evidence, which was erased
pursuant to prison practice well over a year before Plaintiff moved for a preliminary injunction,
given that "[t]he purpose of a preliminary injunction is to preserve the status quo . . . ."
*SymQuest Grp*, 2015 WL 6813599, at *4.

### 2.  Adverse Inference

As Defendants predicted, on December 22, 2015, Plaintiff requested—albeit in a submission that at least partly functioned as a reply in support of his August 4, 2015 Motion—an adverse inference because the evidence was destroyed.  (*See* Pro Se Pl.'s Resp. and Sanction for Spoliation of Evid. Mot. to the Def.'s Mem. of Law in Response to Pl.'s Mot. To. Preserve Evid. ("Pl.'s Evid. Reply"), at unnumbered 1 (Dkt. No. 48).)  Plaintiff is, however, not entitled to an adverse inference at this time.

### a.  Standard and Applicability of New Fed. R. Civ. P. 37(e)

Spoliation refers to "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (internal quotation marks omitted) (2d Cir. 2001); *see also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (same).  Historically, "[a] court's authority to impose sanctions in response to spoliation derives from at least two sources."  *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 288 (S.D.N.Y. 2009).  As one court explained:

> Where a party violates a court order—either by destroying evidence when directed to preserve it or by failing to produce information because relevant data has been destroyed—Rule 37(b) of the Federal Rules of Civil Procedure provides that the court may impose a range of sanctions, including dismissal or judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorneys' fees and costs. Fed. R. Civ. P. 37(b); *see Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106–07 (2d Cir. 2002); *Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and Restaurant Employees International Union*, 212 F.R.D. 178, 219–20 (S.D.N.Y. 2003).   In addition, "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding*, 306 F.3d at 106–07 (citations omitted); *accord West*, 167 F.3d at 779.

*Id.*

Second Circuit law makes clear that, in order to obtain an adverse inference based on the destruction of evidence, the moving party must show, first, "that the party having control over the evidence had an obligation to preserve it at the time it was destroyed," second, "that the records were destroyed with a culpable state of mind," and, third, "that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (internal quotation marks omitted); *see also Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) (same). Well-established Second Circuit law also makes clear that mere negligence is sufficient to trigger the "culpable state of mind" requirement. *See Residential Funding*, 306 F.3d at 108; *see also, e.g.*, *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543, 2015 WL 9480315, at *2 (S.D.N.Y. Dec. 29, 2015); *Zubulake*, 229 F.R.D. at 431; *Johnson v. Waterford Hotel Grp., Inc.*, No. 09-CV-800, 2011 WL 87288, at *2 (D. Conn. Jan. 11, 2011).

Until December 1, 2015, Fed. R. Civ. P. 37(e) provided that, "[a]bsent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." However, courts in the Second Circuit did not apply a different culpability standard for the deletion of electronically stored information than for other evidence. *See, e.g.*, *Bravia Capital Partners Inc. v. Fike*, No. 09-CV-6375, 2015 WL 1332334, at *5 (S.D.N.Y. Mar. 25, 2015) ("Since there was no intervening act of God or other circumstance beyond [the] [p]laintiff's control, the destruction of the emails was at a minimum negligent. Thus, [the] [p]laintiff acted with a culpable state of mind." (citation omitted) (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003))). The Second Circuit's approach was

69

consistent with the logic that "[a] court's authority to impose sanctions in response to spoliation derives from at least two sources," first, when a party has violated a court order, Fed. R. Civ. P. 34(b), and, second, the court's "inherent power to manage its own affairs," *Richard Green*, 262 F.R.D. at 288 (quoting *Residential Funding*, 306 F.3d at 106–07).

On December 1, 2015, however, the new Fed. R. Civ. P. 37(e) went into effect.  Pursuant to that provision:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
>> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>>
>> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>>
>>> (A) presume that the lost information was unfavorable to the party;
>>>
>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>>
>>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).  The Advisory Committee has explained that subdivision 37(e)(2) of Rule 37 "rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence."  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Therefore, Plaintiff stands on shakier legal footing than previous litigants seeking adverse inferences if the December 2015 amendments apply to his Motion.[34]

---

[34] Of course, if the videotape that Plaintiff requests does not constitute "electronically stored information" within the meaning of Rule 37(e), then the Rule 37(e)'s change is beside the point.  While such a legal detour is unnecessary, it is merits noting the issue is, at a minimum,

Under Fed. R. Civ. P. 86(a), any amendments to the Federal Rules of Civil Procedure "take effect at the time specified by the Supreme Court, subject to 28 U.S.C. § 2074," and "govern . . . proceedings after that date in an action then pending unless . . . the Supreme Court specifies otherwise; or . . . the court determines that applying them in a particular action would be infeasible or work an injustice."[35]  In transmitting the proposed changes to Congress, Chief Justice Roberts specified that the 2015 amendments would "govern in all proceedings in civil cases" commenced after December 1, 2015, and, "insofar as just and practicable, all proceedings [ ] pending" on that date.  *See* Order re: Amendments to Federal Rules of Civil Procedure (April

---

the sort over which parties could fight. *Compare Wilder v. Rockdale Cty.*, No. 13-CV-2715, 2015 WL 1724596, at *3 (N.D. Ga. Apr. 15, 2015) (considering the old Fed. R. 37(e) in context of alleged spoliation of a jail cell surveillance video), *and Olson v. Sax*, No. 09-CV-823, 2010 WL 2639853, at *3 (E.D. Wis. June 25, 2010) ("[T]he only evidence before the [c]ourt indicates that the recording over of the video record from July 22, 2008, was part of [the defendant's] routine good faith operation of its video system . . . . Therefore, pursuant to Rule 37(e) of the Federal Rules of Civil Procedure, the [c]ourt denies [the plaintiff's] motion for sanctions."), *with In re Kessler*, No. 05-CV-6056, 2009 WL 2603104, at *16 (E.D.N.Y. Mar. 27, 2009) (considering Rule 37(e) in context of automatically taped-over footage of a fire but indicating that it was "not applicable here"); *see also* Fed. R. Civ. P. 34(a) advisory committee's note to 2006 amendment (noting that "[t]he wide variety of computer systems currently in use, and the rapidity of technological change, counsel against a limiting or precise definition of electronically stored information," and that "[r]eferences elsewhere in the rules to 'electronically stored information' should be understood to invoke this expansive approach").

[35] 28 U.S.C. § 2074 provides in pertinent part:

The Supreme Court shall transmit to the Congress not later than May 1 of the year in which a rule prescribed under section 2072 is to become effective a copy of the proposed rule.  Such rule shall take effect no earlier than December 1 of the year in which such rule is so transmitted unless otherwise provided by law.  The Supreme Court may fix the extent such rule shall apply to proceedings then pending, except that the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies.

29, 2015), *available at* http://www.supremecourt.gov/orders/courtorders/frcv15%28update%29_1823.pdf.

Here, the Court concludes that it would fall short of justice and practicability to apply the new Rule 37(e) to Plaintiff's Motion.  As a general matter, the Court thinks that it makes sense to apply the old rules to motions briefed before the new rules came into effect.  *See Trowery v. O'Shea*, No. 12-CV-6473, 2015 WL 9587608, at *5 n.11 (D.N.J. Dec. 30, 2015) ("Since the parties briefed the motions and conducted oral argument under the prior rule, the [c]ourt finds that it is not just and practicable to apply the amended rules in connection with these motions."). Here, Plaintiff filed an "emergency" motion before discovery even began in his case seeking material that he could have requested in discovery.  Additionally, he did not actually request sanctions until his December 22, 2015 submission to this Court, over four months after Defendants objected to his original Motion and after the new Rule 37(e) went into effect.  (*See generally* Defs.' Evid. Opp'n; Pl.'s Evid. Reply.)  The Court is reluctant to reward Plaintiff's capriciously aggressive tactics by adjudicating his request under a more permissive standard. Nevertheless, because the Court takes seriously its obligation to afford special solicitude to pro se plaintiffs and because the Court does not think that justice would be served by inviting further motion practice surrounding the applicability of Rule 37(e), should Plaintiff initiate it, the Court applies the familiar law of *Residential Funding* and its progeny here.

### b.  December 2013 Footage

The first requirement for a finding of spoliation—that "the party having control over the evidence had an obligation to preserve it at the time it was destroyed," *see Residential Funding*, 306 F.3d at 107—is sufficient to deny Plaintiff's Motion with respect to the December footage. Under well-established Second Circuit law, this obligation "arises when the party has notice that

the evidence is relevant to litigation," which is "most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998); *see also Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *Stinson v. City of N.Y.*, No. 10-CV-4228, 2016 WL 54684, at *4 (S.D.N.Y. Jan. 5, 2016); *Zubulake*, 220 F.R.D. at 216.

As noted, Plaintiff seeks footage from December 6, 2013, December 7, 2013, December 16, 2013, and various points in March 2014.  (*See* Pl.'s Evid. Mot. 2–3.)  With respect to the first two, because the tapes would have been erased by December 28, 2013 at the latest absent staff override, (*see* McBride Decl. ¶¶ 4–5), Plaintiff would have to show that Defendants had "notice that the [tapes] were relevant to litigation" before that date, *Kronisch*, 150 F.3d at 126.  Because Plaintiff's BP-8 was received on December 30, 2013, at least two days after the purge, (*see* Pl.'s Opp'n Ex. B. (BP-8 Form)), Plaintiff must provide some other basis to think Defendants were on notice before he filed his BP-8.  In his reply, Plaintiff vehemently argues that he personally handed a "cop-out" complaint to Susney on December 9, 2013.  (*See* Pl.'s Evid. Reply at 1, 2, 4–6, 11.)[36]  According to Plaintiff, his cop-out "request[ed] . . . investigation of that [f]alse and

---

[36] In their Sur-Reply, Defendants argue that "Plaintiff more likely than not did not submit a cop-out on December 9, 2013," (*see* Defs.' Sur-Reply in Resp. to Pl.'s Mot. To Preserve Evid. 4 (Dkt. No. 61)), because (1) nothing in Plaintiff's BP-8 submission refers to Plaintiff submitting a cop-out to Susney, (*see id.* at 2 (citing Pl.'s Opp'n 45–47)), (2) Susney does not recall receiving a cop-out form Plaintiff in December 2013 or January 2014, (*id.* citing Decl. of David Susney ("Susney Decl.") ¶ 5 (Dkt. No. 62)), (3) Susney reviewed his files, but did not find any cop-out from Plaintiff during the relevant time period, (*id.* (citing Susney Decl. ¶ 6)), (4) agency counsel at the BOP reviewed Plaintiff's Central File and any electronic requests to staff by Plaintiff, but neither contained a reference to a cop-out from December 9, 2013 or a request for an investigation and review of security cameras relating to the December 6, 2013 incident, (*id.* (citing Decl. of Stephanie Scannell-Vessella ¶¶ 5–6, 8 (Dkt. No. 63))), and (5) when Plaintiff met

[f]raudulent incident report made and submitted by . . . Conklin." (*Id.* at 2.) Likewise, Plaintiff argues that he told Defendants to preserve the videotapes. For instance, he says, when speaking with Heli, he "requested the viewing of these security cameras to pro[]ve his innocence and that a false and fraudulent incident report was filed." (*Id.* at 5–6.) Additionally, he suggests that a number of his submissions requested the videotape footage be preserved. (*See id.* at 6 ("Susney re[ei]ved the first filing on Dec. 9, 2013 in the [f]orm of a cop-out in the same fashion as the BP-8, 9, 10 and BP-11 which in all respect is part of the Otisville's legal Department on Dec. 9, 2013 making request received timely for any and all videotape[] footage from Dec. 6, 2013 to not be and prevently [sic] the routinely [sic] deletion of these security cameras #78, 75, 300, 83 and 77.").)

This is insufficient. At the outset, it is worth noting that, unlike in the context of deciding a Motion to Dismiss, the Court is under no obligation to accept as true Plaintiff's submissions. To the contrary, "[a] party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence." *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 200 (S.D.N.Y. 2014) (citing *Byrnie*, 243 F.3d at 108); *see also Gutierrez-Bonilla v. Target Corp.*, No. 08-CV-3985, 2009 WL 5062116, at *3 (E.D.N.Y. Dec. 16, 2009) ("The moving party bears the burden of proving that the alleged spoliator had an obligation to preserve evidence, acted culpably in destroying it, and that the evidence would have been relevant to the

---

with Susney to discuss his putative restraining order filed in the Eastern District of Wisconsin in late February 2014, Plaintiff, according to Susney, alluded to having sent a cop-out regarding Plaintiff's allegations against Conklin, but Susney recalled thinking during that conversation that he had received no such cop-out, (*id.* at 2–3 (citing Susney Decl. ¶ 7)). The Court agrees that these are strong reasons to question whether Plaintiff in fact submitted a cop-out on December 9, 2013. However, because Plaintiff's claims regarding his supposed submission of a cop-out are insufficient to trigger a preservation obligation, the Court need not—and, therefore, at this juncture, does not—take a stand on whether Plaintiff in fact submitted the supposed cop-out.

aggrieved party's case." (internal quotation marks omitted)).  First, even assuming that Plaintiff did provide Susney with a cop-out requesting the videotapes, it is not at all clear that that would be sufficient to convey that the videotape may be relevant to future litigation.  The cop-out may have made clear that the BOP should have been worried about litigation; on the other hand, perhaps the cop-out's tone, informality, and other characteristics would not forecast litigation to a reasonable observer.  The missing details here matter, because imposing spoliation sanctions is serious business, and one which resists broad categorical pronouncements, like that which would be necessary to find notice based on a rumored cop-out per se sufficient to establish notice.  *Cf. Fujitsu*, 247 F.3d at 436 ("The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis.").  Second and relatedly, even if Plaintiff made his desire that the footage be preserved unequivocally clear, it not obvious that Defendants should have known the footage "may be relevant to future litigation."  *Kronisch*, 150 F.3d at 126.  To the contrary, Plaintiff may have wanted the footage not to go on the offense as a plaintiff but rather to clear his name—albeit after his SHU punishment—in connection with Conklin's incident report.  Third, the fact that Plaintiff purportedly requested the footage *before* filing his BP-8 may, if anything, make a reasonable observer less inclined to anticipate litigation.  As courts have recognized, "[t]he first step [in the inmate grievance program] is to submit a BP-8, or informal grievance, to prison staff."  *Baez v. Kahanowicz*, 469 F. Supp. 2d 171, 178 (S.D.N.Y. 2007) (citing 28 C.F.R. Part 542 ("Administrative Remedy")), *aff'd*, 278 F. App'x 27 (2d Cir. 2008).  To the extent Plaintiff declined to take that "first step" and submit a BP-8, opting instead to submit a cop-out first, a reasonable observer could conclude that Plaintiff was expressly declining to embark down the road to litigation.

75

To this, Plaintiff might well respond that his cop-out was, for all practical purposes, the same as a BP-8 and was similarly intended to initiate the litigation process.  Such a response may well be sound, and the Court is certainly not prepared to conclude on the briefing in this case that a cop-out is per se a distinct creature from the BP-8.  *See* 28 C.F.R. §§ 542.13–542.14 (indicating that "before an inmate submits a Request for Administrative Remedy," "an inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue" and later describing a BP-9 as "a formal written Administrative Remedy Request"); *see also Bailey v. Fortier*, No. 09-CV-742, 2012 WL 6935254, at *2 (N.D.N.Y. Oct. 4, 2012) ("This informal, initial procedure [described in 28 C.F.R. § 542.13(a)] typically begins with the filing of a 'cop-out,' which can be submitted either on a BP-8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description."), *adopted by* 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); *Bastien*, 2015 WL 5008837, at *5 ("The law is clear that the 'Inmate Request to Staff' forms submitted by [the] plaintiff, commonly known as 'cop out' forms, are informal requests to prison staff to resolve disputes, and are only the first step in the clearly established multi-level system within the Bureau of Prisons Administrative Remedy Program."); Families Against Mandatory Minimums, *How To Help your Loved Ones in Federal Prison*, *available at* http://famm.org/wp-content/uploads/2013/08/FS-Help-a-Federal-Prisoner-2.23.11-NW.pdf ("The prisoner begins the administrative remedy process by filling out a 'cop-out' (also known as a BP-8 form) and giving it to staff.").  However, the problem with embarking down this road is that it would seem inconsistent with the many documents and statements in this case that Plaintiff submitted his BP-8 on December 28, 2013.  (*See, e.g.*, Am. Compl. ¶ 29; Pl.'s Opp'n ¶¶ 2–3; Pl.'s Opp'n Ex. B. (BP-8 Form); Pl.'s Opp'n Ex. C (BP-8 Response).)  It may well be plausible that Plaintiff did submit a cop-out on December 9 that

reasonably forecast his litigious designs and then later decided to submit a second informal grievance, rather than proceed to the next stage of the administrative remedy process.  But that is not the question.  Rather, the issue is whether Plaintiff has met his burden of showing that Defendants were under a duty to preserve the evidence at the time of its erasure.  *See Gutierrez-Bonilla*, 2009 WL 5062116, at *3; *Zubulake*, 220 F.R.D. at 216.  Here, there are just too many question marks hanging over the contents of Plaintiff's cop-out.

Likewise, Plaintiff has not met his burden with respect to the December 16, 2013 video. (*See* Pl.'s Evid. Mot. 2–3.)  December 16 simply is not a meaningful date in this litigation.  If the Court reviewing Plaintiff's Motion for spoliation sanctions cannot discern what about the December 16 footage is relevant to this litigation, it doubts very much that Defendants "should have known that the evidence may be relevant to future litigation" before it was destroyed. *Kronisch*, 150 F.3d at 126.[37]

### c.  March Footage

The Court is similarly not prepared to conclude that Defendants had notice of an obligation to preserve evidence from March 2014; however, the question is closer.  Because Plaintiff's claims related to that footage may be barred by the PLRA exhaustion requirement, however, the Court declines to determine whether Defendants have indeed let documents which should have been preserved be destroyed.

To begin, Plaintiff submitted a large number of written complaints to prison authorities in early March 2014.  (*See* Pl.'s Opp'n Ex. G (Letter from Pl. to Warden (Mar. 4, 2014))

---

[37] Of course, for the same reason, Plaintiff cannot meet his burden of showing that it is relevant.  *See Residential Funding Corp.*, 306 F.3d at 107 (requiring the party seeking an adverse inference to show "that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense").

(addressing Plaintiff's desire for signed copy of his February 25, 2014 affidavit, need for hand braces, lack of heat, and generalized allegations of cruel and unusual punishment); Pl.'s Opp'n Ex. H (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)) (complaining about inability to use phone in SHU); Pl.'s Opp'n Ex. I (Letter from Pl. to SHU lieutenant (Mar. 6, 2014)) (asking for copy of his affidavit); Pl.'s Opp'n Ex. J (Letter from Pl. (March 9, 2014)) (asking to speak with Susney); Pl.'s Opp'n Ex. K (Letter from Pl. to SHU lieutenant (Mar. 6, 2014)) (saying that he was in the SHU for a restraining order against Conklin but that Conklin is feeding him); Pl.'s Opp'n Ex. L (Letter from Pl. to SHU lieutenant (Mar. 7, 2014)) (saying that he "need[ed] to make more than one phone call"); Pl.'s Opp'n Ex. M (Letter from Pl. to Warden (Mar. 5, 2014)) (complaining that he was being prevented from using the phone, was "not allowed to w[]atch any T.V.," and was "subjected to . . . cold confinement"); Pl.'s Opp'n Ex. W (Letter from Plaintiff to Demeo (Mar. 11, 2014)); Pl.'s Opp'n Ex. X (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)).)

With the possible exception of Plaintiff's March 6, 2014 letter (to be discussed below), these letters do not indicate that Defendants "should have known that the evidence may be relevant to future litigation." *Kronisch*, 150 F.3d at 126. Indeed, to hold otherwise would essentially lay down a rule that prison officials should anticipate litigation whenever an inmate makes a complaint about any condition of his confinement. Given that "an adverse inference instruction is an extreme sanction and should not be imposed lightly," *Curcio v. Roosevelt Union Free Sch. Dist.*, 283 F.R.D. 102, 107 (E.D.N.Y. 2012) (internal quotation marks omitted), the Court does not think the bar to finding its predicate obligation to preserve evidence should be so low, *compare Grant v. Salius*, No. 09-CV-21, 2011 WL 5826041, at *1, *3 (D. Conn. Nov. 18, 2011) (finding the defendants had no duty to preserve video footage despite the plaintiff's

submitted administrative remedies where the loss was attributable to third parties), *with Barnes v. Alves*, 58 F. Supp. 3d 296, 300 (W.D.N.Y. 2014) (considering inmate's spoliation motion where the inmate requested preservation of the tape at issue in an earlier grievance).

 However, Plaintiff's March 6, 2014 letter may be different.  That letter, addressed to "SHU Lt." and apparently written on "March 6, 2014 [at] 6:am [sic]," reads in its entirety:

> I am in the SHU right now for a restraining order agains[t] c/o P. Conklin and "for my protection," as SIS claim.  And now you have the same officer at my door feeding me!!!  [T]his is in clear violation of my restraining order and this is being recorded for future litigation.  SHU #209 Charles T. McIntosh Breakfast # 08770-089.

(Pl.'s Opp'n Ex. K (Letter from Pl. to SHU lieutenant (Mar. 6, 2014)).

 Although the Court is not prepared to say that Plaintiff's allusion to "future litigation" is per se enough to establish notice, *cf. Siggers v. Campbell*, No. 07-CV-12495, 2014 WL 4978648, at *3 (E.D. Mich. Mar. 25, 2014) (declining to find an obligation to preserve evidence despite "some rumblings" about filing a lawsuit, because the plaintiff had not established that she saw the document), *aff'd* 2014 WL 4978655 (E.D. Mich. Oct. 6, 2014), this letter is obviously a closer call than the others.  However, as noted earlier, it is not enough to conclude that Defendants had a duty to preserve the video footage; rather, "to obtain an adverse inference instruction, a party must establish that the unavailable evidence is 'relevant' to its claims or defenses."  *Residential Funding*, 306 F.3d at 108; *see also Zubulake*, 220 F.R.D. at 218 (same). In this sense, relevance demands something more than that it be sufficiently probative under Fed. R. Evid. 401; "[r]ather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction."  *Residential Funding*, 306 F.3d at 109 (alterations and internal quotation marks omitted); *Stinson*, 2016 WL

54684, at *7.  Nevertheless, "[c]ourts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence," lest they "subvert the purposes of the adverse inference, and . . . allow parties who have destroyed evidence to profit from that destruction." *Residential Funding*, 306 F.3d at 109 (alterations and internal quotation marks omitted).  Consequently, "a court's role in evaluating the 'relevance' factor in the adverse inference analysis is limited to insuring that the party seeking the inference had adduced enough evidence of the contents of the missing materials such that a reasonable jury *could* find in its favor."  *Id.* at 109 n.4 (emphasis in original).[38]

The relevance of the March footage is very much in doubt.  Indeed, as discussed above, Defendants have sought dismissal of Plaintiff's claims for failure to exhaust in accordance with the PLRA other than those relating to the December 6, 2013 dispute with Conklin.  (*See* Defs.' Mem. 12–16.)  And, as also discussed, Defendants may well be entitled to summary judgment on those claims if Plaintiff failed to exhaust his administrative remedies.  If that should come to pass, it is not clear to this Court how Plaintiff "ha[s] adduced enough evidence of the contents of [that video tape] such that a reasonable jury could find in [his] favor" on the claims related to the events of December 6, 2013.  *Residential Funding*, 306 F.3d at 109 n.4 (emphasis omitted). Accordingly, before delving into the thorny legal questions of whether Defendants had an obligation to preserve evidence and whether Plaintiff can show negligence, the Court declines to

---

[38] It is worth observing here that "a finding that a party breached its discovery obligations in bad faith is sufficient to establish the relevance of untimely produced or destroyed evidence as a matter of law; a finding that a party breached its obligations through gross negligence is 'frequently' sufficient."  *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (citing *Residential Funding*, 306 F.3d at 109).  The Court does not see any reason to conclude that the deletion of the video was conducted in bad faith, however, and, accordingly, will not dispense with the relevance requirement.

rule on Plaintiff's spoliation Motion with respect to the March videotape request until after it has decided the PLRA exhaustion issue.

Finally, and for sake of completeness, it is worth making explicit that Defendants need not have anticipated litigation of the March 2014 events on the basis of Plaintiff's late 2013 BP-8 and related filings.  (Pl.'s Opp'n Ex. B. (BP-8 Form).)  Although Plaintiff's Amended Complaint offers a single, comprehensive lament detailing his various run-ins with Conklin and stays in the SHU from December 2013 through early 2014, the events are conceptually distinct, and there is no reason to conclude Defendants were on notice of potential future litigation over the events of March 2014 through this earlier set of filings.

### D.  Request for Counsel

Lastly, appended on to the end of Plaintiff's Amended Complaint is a request for the appointment of pro bono counsel.  (*See* Am. Compl. ¶¶ 113–15.)  Although there is no constitutional right to counsel in civil cases, courts have the authority to appoint counsel for indigent plaintiffs.  *See* 28 U.S.C. § 1915(e)(1).  Nevertheless, "[b]road discretion lies with the district judge in deciding whether to appoint counsel pursuant to this provision."  *Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986).  When analyzing whether appointment of counsel is appropriate, the Court undertakes a two-step inquiry.  *See Ferrelli v. River Manor Health Care Ctr.*, 323 F.3d 196, 203–04 (2d Cir. 2003).  First, the Court "should [ ] determine whether the [movant]'s position seems likely to be of substance."  *Id.* at 203 (quoting *Hodge*, 802 F.2d at 61); *see also Johnston v. Maha*, 606 F.3d 39, 41 (2d Cir. 2010) ("This [c]ourt considers motions for appointment of counsel by asking first whether the claimant has met a threshold showing of some likelihood of merit." (internal quotation marks omitted)).  The claim must not be so "highly dubious" that the plaintiff appears to have no chance of success.  *Hodge*,

802 F.2d at 60 (internal quotation marks omitted).  In making this determination, the Court

construes pleadings drafted by pro se litigants liberally and interprets them to raise the strongest

arguments that they suggest.  *See Triestman*, 470 F.3d at 474–75.

Second, if the threshold requirement is met, the Court will then proceed to consider other

prudential factors such as the movant's

> ability to investigate the crucial facts, whether conflicting evidence implicating the
> need for cross-examination will be the major proof presented [to the fact finder],
> [the movant]'s ability to present the case, the complexity of the legal issues[,] and
> any special reason . . . why appointment of counsel would be more likely to lead to
> a just determination.

*Ferelli*, 323 F.3d at 203–04 (internal quotation marks omitted); *see also Garcia v. USICE (Dep't

of Homeland Sec.)*, 669 F.3d 91, 98–99 (2d Cir. 2011) (listing *Hodge* factors).

Here, Plaintiff requests counsel because, he says, "when a colorable claim of

constitutional violation is presented, the trial court is under a mandatory duty to appoint

counsel."  (Am. Compl. ¶ 113.)  Further, Plaintiff argues that his injuries are "the consequences

of a [sic] numerous and continuing injuries, and that made of proceeding is much to be preferred

to piece mail [sic] litigation despite the possible loss in accuracy."  (*Id.* ¶ 114.)  Plaintiff also

recites several lines concerning the liberal construction of pro se complaints as well as the pre-

*Twombly* 12(b)(6) standard.  (*Id.*)

Even assuming that the threshold requirement has been met, the various prudential

considerations militate against the appointment of counsel here.  First, Plaintiff does not indicate

why he would need counsel to help investigate the facts of the case.  While a pro se litigant will

often "be found unable to investigate the facts of his or her claim where, for example, he or she

will be incarcerated for the duration of the case,"  *Walters v. N.Y.C. Health Hosp. Corp.*, No. 02-

CV-751, 2002 WL 31681600, at *2 (S.D.N.Y. Nov. 25, 2002) (citing *Hendricks v. Coughlin*, 114

F.3d 390, 394 (2d Cir. 1997)), that concern is less compelling here because Plaintiff was witness

to most, if not all, of the events and facts giving rise to his claims, *see Goodson v. Sedlack*, No.

99-CV-10419, 2000 WL 278087, at *2 (S.D.N.Y. Mar. 14, 2000) (declining to appoint counsel

where "[the] plaintiff ha[d] an intimate knowledge of the facts and circumstances which [were]

the most relevant to [the] action[,]" though the "[p]laintiff's ability to investigate the case, due to

his incarceration, is limited").  Moreover, Plaintiff's submissions to this Court suggest that

Plaintiff will be able to adequately investigate the facts of his case.  In addition to filing a

motion—albeit a procedurally inappropriate one—successfully identifying discovery that

Plaintiff felt was germane to his claims, Plaintiff attached a great many relevant documents to his

Opposition to Defendants' Motion to Dismiss, suggesting that he should be able to investigate

the facts of his case. *See Bonilla v. Potter*, No. 04-CV-3205, 2006 WL 995195, at *2 (S.D.N.Y.

Apr. 17, 2006) (noting that "many of the documents attached to [the plaintiff's] complaint will

undoubtedly be used by him as exhibits at the trial of the instant action to support the factual

allegations he has made," and that he "[t]herefore . . . will not need the assistance of counsel to

undertake any investigation to uncover these documents or relevant facts").  Additionally,

although Plaintiff's claims are complicated by their volume and extent of attendant motion

practice, the underlying legal issues are not so complex as to demand the appointment of

counsel. *See Davis v. Barrett*, No. 02-CV-545, 2010 WL 1407291, at *1 (W.D.N.Y. Mar. 31,

2010) (denying request for pro bono counsel in connection with claim that the plaintiff was

denied due process in course of administrative segregation hearing where "the facts in th[e]

matter [were] not complex and [the] plaintiff ha[d] demonstrated his capacity to articulate to the

[c]ourt both the facts and legal theories supporting his claim"); *Armstrong v. N.Y.C. Dep't of

Corr.*, No. 97-CV-7388, 1999 WL 61841, at *1 (S.D.N.Y. Feb. 10, 1999) (finding Eighth

Amendment claim "not a complex issue"); *Maldonado v. Candidus*, No. 97-CV-4794, 1998 WL 690817, at *1 (S.D.N.Y. Sept. 30, 1998) ("[The plaintiff's] claims [including a claim of retaliatory action] do not appear so overwhelmingly complex that he cannot be afforded a just determination without legal representation").  Lastly, the fact that Plaintiff has not explained what attempts, if any, he has made to find an attorney on his own cuts against the appropriateness of the Court appointing pro bono counsel.  *See Wise v. Superintendent of Attica Corr. Facility*, No. 08-CV-6312, 2009 WL 3165626, at *1 (W.D.N.Y. Sept. 25, 2009) ("[The plaintiff] does not explain what attempts, if any, he has made to retain an attorney, or have one represent him pro bono.  He merely states that he is confined at Attica Correctional Facility.  This fact alone does not preclude him from pursuing his own efforts, which he must do initially, to obtain representation for himself.").  It is true that "conflicting evidence implicating the need for cross-examination" may be "the major proof presented to the fact finder," *Hodge*, 802 F.2d at 61–62, in light of the dispute over the accuracy of Conklin's incident report.  However, as the foregoing analysis makes clear, this is just one of many factors, and, on balance, the Court thinks the appointment of counsel is not warranted in this matter at this time.  Should circumstances change, Plaintiff may reapply for appointment of pro bono counsel.

### III.  Conclusion

 For the foregoing reasons, the Court grants Defendants' Motion To Dismiss in part and denies in part Plaintiff's August 4, 2015 Motion.  (*See* Dkt. Nos. 23, 32.)  More specifically, the Court permits the Parties to engage in limited discovery on the issue of Plaintiff's PLRA exhaustion as described herein, and, with respect to the concededly exhausted claims:

- Dismisses Plaintiff's claims against Whinnery, Dachisen, Diehl, Hickman, and Susney for lack of personal involvement;

- Dismisses Plaintiff's claims against Recktenwald for lack of personal involvement, except insofar as they relate to her denial of Plaintiff's false incident report grievance;

- Dismisses Plaintiff's remaining claims against Recktenwald, as she is entitled to qualified immunity;

- Dismisses all claims brought against individual Defendants in their official capacities, as they are barred by the doctrine of sovereign immunity;

- Dismisses all claims brought pursuant to the FTCA;

- Dismisses Plaintiff's § 1986 claims;

- Dismisses Plaintiff's Sixth Amendment right-to-counsel claims;

- Dismisses Plaintiff's Fifth Amendment access-to-the-court claims;

- Dismisses Plaintiff's retaliation claim; and

- Denies Plaintiff's August 4 Motion in its entirety, except that the Court declines to rule on the question of sanctions relating to Defendants' preservation of the March 2014 footage.

Within 30 days of this Opinion, Plaintiff may file a Second Amended Complaint.

The Clerk of the Court is respectfully requested to terminate the pending Motions. (*See* Dkt. No. 23, 32.)

SO ORDERED.

Dated:     March 3/ , 2016
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

85